Patricia **GERESSY** and Patricia Geressy as Administratrix of the Estate of Thomas A. Geressy, Jeannette Rotolo and John William Rotolo, and Jill M. Jackson and Thomas M. Farrell, Plaintiffs,

v.

**DIGITAL EQUIPMENT CORPORATION,**
**Defendant.**

No. 94–CV–1427 (JBW).

United States District Court,
E.D. New York.

Sept. 16, 1997.

Kenneth J. King, Craig M. Deitelzweig, Charna L. Gerstenhaber, Beatie, King & Abate, New York, NY, for Defendant.

Steven Phillips, Stephenie Lannigan Bross, Levy Phillips & Konigsberg, New York, NY, for Plaintiffs.

**644**

WEINSTEIN, Senior District Judge:

## Table of Contents

I. INTRODUCTION ................................................... 645

II. FACTS.......................................................... 645
 A. Patricia Geressy ........................................... 645
 B. Jill M. Jackson ........................................... 645
 C. Jeannette Rotolo .......................................... 645

III. LAW AND ITS APPLICATION ..................................... 646
 A. Federal Rules On Setting Aside Verdicts ................... 646
 1. Law ................................................... 646
 2. Application of Law to Facts ............................ 647
 a. Due Diligence Prior to and During Trial ........... 647
 b. Existence at Time of Trial ........................ 648
 c. Non–Cumulative Evidence ........................... 648
 d. Witness Credibility ............................... 648
 e. Admissibility and Materiality ..................... 648
 f. Substantial Probability of a Change in the Outcome at Trial ....... 648
 B. Experts ................................................... 648
 C. Warnings .................................................. 649
 1. Law ................................................... 649
 2. Application of Law to Facts ............................ 650
 D. Statute of Limitations .................................... 650
 1. Law ................................................... 650
 2. Application of Law to Facts ............................ 651
 a. Patricia Geressy .................................. 651
 b. Jill M. Jackson .................................. 652
 c. Thomas M. Farrell ................................ 652
 d. Jeannette Rotolo .................................. 652
 E. Injury to Spouse Prior to Marriage ....................... 652
 1. Law ................................................... 652
 2. Application of the Law to the Facts .................... 653
 F. Deviation of Verdict ...................................... 653
 1. Law ................................................... 653
 a. Identifying the Normative Group for Comparison .... 657
 b. Deviation from the "Normal" Group ................ 657
 c. Defining *Material Deviation* ..................... 658
 d. Burden of Proof ................................... 660
 2. Application of Law to Facts ............................ 660
 a. Patricia Geressy .................................. 660
 b. Jill M. Jackson .................................. 662
 c. Jeannette Rotolo .................................. 663

IV. CONCLUSION .................................................... 663

APPENDIX A
 COMPARABLE CASES CONSIDERED ................................... 664

Appendix B
 Patricia Geressy: Tentative Computations ...................... 675

Appendix C
 Jill M. Jackson: Tentative Computations ...................... 675

Appendix D
 Jeanette Rotolo: Tentative Computations ...................... 676

## I. INTRODUCTION

In suits commenced on March 16, 1994, plaintiffs Geressy, Jackson and Rotolo claimed that use of Digital's LK201 computer keyboard caused repetitive stress injuries (RSI). Their husbands alleged loss of consortium. The jury returned a verdict in favor of all plaintiffs on failure to warn claims, rejecting negligent design claims and declining to award punitive damages.

Defendant moved in all cases for judgment as a matter of law, a new trial and remittitur. More recently defendant sought a new trial on the Geressys' claims based on newly discovered evidence.

For the reasons indicated below, viewing the evidence most favorably to support the verdicts, only that for Jeannette Rotolo can stand. Newly discovered evidence requires a new trial on the claims of Patricia Geressy and the estate of Thomas A. Geressy. The claims of John William Rotolo are dismissed since, having been married after his wife was injured, he suffered no loss of consortium. Those of Jill M. Jackson and her husband, Thomas A. Farrell, are dismissed on statute of limitations grounds.

## II. FACTS

### A. Patricia Geressy

Ms. Geressy worked as a secretary at the Port Authority for five years in the 1960s and again from 1984 until the present. She used defendant's keyboard and did other secretarial work. She had never been told that use of the keyboard might cause RSI.

She testified that the first manifestation of her condition "was [in] the summer of 1991. I started waking up at night with numbness, tingling in my hands, burning in my wrists, I didn't think much of it at the time."

Initially, Ms. Geressy's most severe problems were with her left wrist and hand. She underwent surgery for that wrist and hand in December of 1991. Because her first surgery was not successful, Ms. Geressy had a second operation in May of 1992. The second operation also gave no relief. She then started to experience pain in her right wrist and hand, her neck, and her shoulders. By the time the failure of her first two operations was known, the problems throughout her upper extremities had intensified. A third operation, on her neck, was recommended and eventually performed. By the end of 1994 her then treating doctor recommended surgery for her right hand.

After four operations and other therapy, Ms. Geressy's condition has continued to deteriorate. She has very little use of either hand.

Plaintiffs' experts testified that these problems were due to use of defendant's keyboard which presented ergonomic dangers requiring warnings to the user. Defendant's experts testified to the contrary, attributing plaintiff's physical symptoms to natural causes, finding no keyboard dangers, and no need to warn.

### B. Jill M. Jackson

In the 1980s Ms. Jackson worked intensively at one of defendant's computers without warnings of dangers. Some time around Christmas of 1989 she experienced "a pinching pain in [her] left elbow one day at work." She was treated with cortisone. She had elbow pain again a few months later in 1990 and sought the advice of another doctor. In filling out preliminary medical forms, she included in her complaints "lower back pain, right hip pain after sitting," and pain in the "upper right back shoulder area."

From 1990 on she has experienced debilitating pain in her elbows, forearms and hands, as well as a severe loss of strength in her upper extremities. In 1994 her disabilities forced her to leave her position as a legal secretary and to begin training in a new field.

### C. Jeannette Rotolo

Ms. Rotolo—married on May 15, 1993— has a short history of poor health. Until the onset of RSI, she was a "very athletic person," involved in such sports as karate and horseback riding. In April of 1993, Ms. Rotolo, a secretary using defendant's keyboard, first experienced symptoms of RSI. At work,

she began to notice that her hands were "cold and stiff" and that she made an undue number of mistakes in typing. By June she began dropping things. Eventually the pain become constant.

In the years since her first symptoms, Ms. Rotolo has been diagnosed with a variety of specific RSIs. She has tried numerous treatments, from physical therapy to surgery on her wrists and hands. Since September of 1993, Ms. Rotolo has not been able to return to clerical work, although she has been able to do some lower-paid child care work that does not exacerbate her condition.

### III. LAW AND ITS APPLICATION

This is a diversity action governed by federal procedural law and the substantive law of New York state. *See, e.g., Erie Railroad v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Gasperini v. Center for Humanities, Inc.,* 518 U.S. 415, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996).

### A. Federal Rules On Setting Aside Verdicts

#### 1. Law

In deciding Rule 50(b) motions for judgment as a matter of law the evidence is viewed most favorably to the party defending the jury's verdict.

In ruling on a motion for judgment as a matter of law under Fed.R.Civ.P. 50(b) . . . a district court is required to consider the evidence in the light most favorable to the party against whom the motion was made and to give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence. The court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury. . . . Only if there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against [the moving party] may the court properly grant the motion.

*LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 429 (2d Cir.1995), *cert. denied sub nom., Village of Airmont, N.Y. v. LeBlanc–Sternberg,* —— U.S. ——, 116 S.Ct. 2546, 135 L.Ed.2d 1067 (1996) (citations omitted) (internal quotation marks omitted),

Motions for a new trial under Rule 59(a) give the trial court more leeway. The rule provides:

A new trial may be granted to all or any of the parties on all or part of the issues . . . in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States. . . .

Fed.R.Civ.P. 59(a). *See, e.g., Holzapfel v. Town of Newburgh, N.Y.,* 950 F.Supp. 1267, 1272 (S.D.N.Y.1997) ("a less stringent standard applies to a motion for a new trial than to a motion for judgment as a matter of law") (citations omitted). In contrast to the standard for judgment as a matter of law, "a new trial may be granted even if there is substantial evidence to support the jury's verdict. . . . [A] trial judge hearing a motion for a new trial 'is free to weigh the evidence himself and need not view it in the light most favorable to the verdict winner.'" *Song v. Ives Labs.,* 957 F.2d 1041, 1047 (2d Cir.1992).

When the motion pursuant to Rule 59 for a new trial is based on newly discovered evidence, the criteria for granting has been stated as:

(1) the evidence was newly discovered since the trial; (2) the moving party was diligent in discovering the new evidence; (3) the newly discovered evidence could not be merely cumulative or impeaching; (4) the newly discovered evidence was material; and (5) that a new trial, with the newly discovered evidence, will probably produce a different result.

*Joseph v. Terminix Int'l Co.,* 17 F.3d 1282 (10th Cir.1994) (citations omitted) (internal quotation marks omitted). Put more concisely the factors are:

The new evidence [must be] (1) be material and not merely cumulative, (2) could not have been discovered before trial through the exercise of reasonable diligence and (3)

would probably have changed the outcome of the trial.

*Compass Tech. v. Tseng Labs.*, 71 F.3d 1125, 1130 (3d Cir.1995) (citations omitted).

■ For the purposes of the instant case the factors to be considered in deciding whether a new trial based on new evidence should be granted are: (1) despite the exercise of due diligence, the moving party was not able to obtain the newly discovered evidence during trial; (2) it existed at the time of trial; (3) it is not cumulative; (4) it is not exclusively about the credibility of a witness; (5) it would probably have been admissible because it is both material and does not violate the rules of evidence and (6) there is a substantial probability that it would have changed the outcome of the trial.

Other than the time for filing and the nature of the burden on the moving party, "Rule 59 and Rule 60(b)(2) share the same standard for granting relief on the basis of newly discovered evidence." *Compass Tech. v. Tseng Labs.*, 71 F.3d 1125, 1130 (3d Cir. 1995). All motions were received prior to the issuing of any final judgment and therefore time limits that come into play after the entry of final judgement are not relevant.

**2. Application of Law to Facts**

■ National publicity followed the announcement of the jury verdict in December of 1996. *See, e.g.*, Diana B. Henriques, *Big Jury Award in Injury Case Over Keyboards,* N.Y. Times, December 10, 1996, at D1; Jon Auerbach and Laura Johannes, *Digital Equipment Loses Verdict on Carpal Tunnel,* Wall St. J., Dec. 10, 1996, at B4. The news of Ms. Geressy's nearly $5.3 million verdict against defendant reached Gary S. Gevisser, Chief Executive Officer of Sunmed, Inc. (formerly known as Injury Evaluation Consultants (IEC)) in Las Vegas, Nevada. The information struck Mr. Gevisser as particularly noteworthy because, before the litigation had been commenced, doctors from his company had examined Ms. Geressy, prepared a medical evaluation on her condition for The Port Authority of New York and New Jersey (the IEC Report) and, contrary to the jury finding at trial, had determined that her ill health was unrelated to her work.

*See* Affidavit of Kenneth J. King, sworn to March 25, 1997 ¶¶ 10, 11, Exhibit A (King Affidavit). Mr. Gevisser contacted Digital Equipment Corporation to explain his knowledge of the *Geressy* case and his company's own information regarding Ms. Geressy, *See* King Affidavit ¶ 11. Defendant then subpoenaed the IEC Report and filed the instant motion for a new trial based on discovery of this evidence.

**a. Due Diligence Prior to and During Trial**

Defendant exercised due diligence to obtain every possible medical record regarding Ms. Geressy prior to trial. Defendant requested:

the name(s) and address(es) of all medical or health care personnel, and each physician, practitioner, medical facility, clinic and hospital that saw, examined, treated or consulted with Patricia Geressy in connection with [the complained of] injury.

King Affidavit, Exhibit 13 (Digital Equipment Corporation's First Set of Interrogatories for Plaintiffs Patricia Geressy and Thomas A. Geressy ¶ 4). Also sought were:

All medical records, doctors' reports, hospital records, and any other material relevant to the health and physical well-being of plaintiff Patricia Geressy.

All documents relating in any way to the amount(s) and source(s) by which any costs or expenses for medical care, dental care, custodial care, rehabilitation services, loss of earnings or other economic loss for which plaintiff[ ] seek[s] to recover in this action, was or may be replaced or indemnified, in whole or in part, from any collateral source including, but not limited to, insurance, social security, workers' compensation, or employee benefit.

King Affidavit, Exhibit C (Notice to Produce ¶¶ 3, 5). Defendant also obtained authorizations for all medical records which were to include names and addresses of all health care providers. See King Affidavit, Exhibit D (Demand for Executed Authorizations ¶¶ 1, 3). Defendant repeatedly asked Ms. Geressy at her deposition to identify all healthcare providers. See King Affidavit,

Exhibit E (June 25, 1996 Deposition Transcript of Patricia Geressy). There is no doubt that defendant was diligent in seeking all relevant medical records, including the IEC Report, prior to trial.

### b. Existence at Time of Trial

IEC evaluated Ms. Geressy on August 18, 1993 and issued a report shortly thereafter. The IEC Report was in existence years before the trial took place in the fall of 1996.

### c. Non-Cumulative Evidence

The IEC Report reflects the results of an Integrated Movement Analysis (IMA), described as follows:

> Integrated Movement Analysis is a modality that allows the diagnostician an opportunity to monitor the voluntary and involuntary responses of muscle groups, in direct correlation with the patient's range of motion, in order to assess the viability of alleged myofascial-type injuries. This highly reliable monitoring system allows the treating physician an opportunity to validate the existence of subjectively reported symptoms in an objective format and can further establish the clinical and pathological significance of other tests, such as MRIs, when findings are present.

King Affidavit, Exhibit A (the IEC Report). The admission of the IEC Report would not have been cumulative. No other experts presented similar evidence.

### d. Witness Credibility

The proffered IEC Report is unrelated to issues of witness credibility at trial.

### e. Admissibility and Materiality

Mary Rose Cusimano, who has a doctorate in psychology and who co-authored the IEC Report has expressed her willingness to testify in court. See Reply Affidavit of Kenneth J. King, sworn to April 23, 1997, Attachment (Cusimano Affidavit ¶ 4) (Reply King Affidavit). It appears likely that Ms. Cusimano's expert testimony would have been admissible and that the IEC Report would have served as a foundation. See Fed.R.Evid. 702, 703. The IEC Report states that:

> [Ms. Geressy's] complaints of carpal tunnel like symptoms are related to hypertonicity in the cervical region. . . . The readings of the IMA indicate a causal relationship to the symptoms reported by the patient that are non work related in nature. . . . Causation is . . . from the cervical region and appears to be non industrial in nature.

King Affidavit, Exhibit A (the IEC Report). In her recent sworn affidavit, Ms. Cusimano summarized the findings of that report:

> We saw no evidence of any cumulative trauma disorder or any injury due to repetitive motion. We concluded that she did not have carpal tunnel syndrome but that her complaints were caused by pathology in her cervical musculature. Based on our examination we concluded that her health complaints were not caused by her work.

Reply King Affidavit, Attachment (Cusimano Affidavit ¶ 33). This Report and expert explanatory testimony went to the heart of a central issue at trial——the cause of Ms. Geressy's injuries.

### f. Substantial Probability of a Change in the Outcome at Trial

This newly discovered evidence is unique and directly relevant to the critical issue of causation. It is substantially probable that this medical report, created almost a year before the instant litigation was filed and obviously unconnected to it, would have caused the jury to evaluate all of the evidence at trial differently. The outcome at trial could well have been different if this evidence had been available.

This new evidence satisfies all of the factors for granting a new trial based on new evidence pursuant to Rule 59(a) of the Federal Rules of Civil Procedure. Because the motion was timely pursuant to Rule 59(b), the court need not consider Rule 60(b)(2) which would, in any event, have provided an alternative basis for granting a new trial in the exercise of discretion.

### B. Experts

No serious question was raised about the admissibility of expert evidence. All such testimony was admissible since it was helpful to the jury in determining the issues, and the

reasoning, techniques, methodology and bases were scientifically appropriate. See Fed. R.Evid. 702, 703; *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

## C. Warnings

### 1. Law

■ A "manufacturer's knowledge of special risks of harm attendant upon normal use of his product imposes a duty upon the manufacturer to warn adequately those using his product of those risks." *Ezagui v. Dow Chemical Corp.*, 598 F.2d 727, 732 (2d Cir. 1979) (citations omitted). *See also, e.g., Amatulli v. Delhi Constr. Corp.*, 77 N.Y.2d 525, 532, 571 N.E.2d 645, 648, 569 N.Y.S.2d 337, 340 (1991) ("A manufacturer who places into the stream of commerce a defective product which causes injury may be liable for such injury. A defect in a product may consist of a mistake in manufacturing, an improper design or the inadequacy or absence of warnings for the use of the product.") (citations omitted); *Enright by Enright v. Eli Lilly & Co.*, 77 N.Y.2d 377, 568 N.Y.S.2d 550, 555, 570 N.E.2d 198 (1991); *Wolfgruber v. Upjohn Co.*, 72 A.D.2d 59, 62, 423 N.Y.S.2d 95, 97 (4th Dep't 1979), *aff'd mem.* 52 N.Y.2d 768, 417 N.E.2d 1002, 436 N.Y.S.2d 614 (1980).

The nature of the failure to warn tort in New York is fairly straight forward. *See* 1 N.Y. Pattern Jury Instructions—Civil § 2:135 (1974) ("The manufacturer of a product which is reasonably certain to be dangerous if used in a way which he should reasonably foresee it would be used is under a duty to exercise reasonable care to give reasonable and adequate warning of any dangers known to him or which in the exercise of reasonable care he should have known and which the user of the product ordinarily would not discover. Reasonable care means that degree of care which a reasonably prudent person would exercise under the same circumstances."); IA N.Y. Pattern Jury Instructions—Civil § 2:135 (3d ed.1996). *See also* Restatement (Third) of Torts § 2(c) (Draft adopted at May 1997 meeting of American Law Institute) ("A product is defective when, at the time of sale or distribution, it contains a manufacturing defect, is defective in design, or is defective because of inadequate instructions or warnings. A product ... is defective because of inadequate instructions or warnings when the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the seller or other distributor, or a predecessor in the commercial chain of distribution and the omission of the instructions or warnings renders the product not reasonably safe.").

■ Whether it is reasonably safe "when marketed" depends in part on what the manufacturer knew or should have known at the time of marketing—i.e., the state of the art. The manufacturer may be found to be unreasonable even after the product has been marketed if it should have been aware of dangers and it was reasonable to try to bring them to the attention of users of the product in the field.

The relevant portions of the charge, without substantial objection, became the law of the case:

.... A failure to warn or an inadequate warning about dangers attendant upon the use of the product may make the product not reasonably safe and therefore defective even if it was otherwise properly designed, manufactured and sold.

A manufacturer of a product which is likely to be dangerous if utilized in an intended or reasonably foreseeable manner is under a duty to give adequate warning which would be useful to the user of any known dangers or dangers which in the exercise of reasonable care it should have known and which those foreseeably exposed to these products ordinarily would not discover. It is sufficient that a reasonable manufacturer which knew of the product's potential for causing injury would have concluded that the product should not have been marketed without suitable warnings.

When we talk of exercising "reasonable care" to give a warning, we mean that degree of care which a reasonably prudent person would exercise under the same circumstances.

The manufacturer must keep informed of knowledge of the effect of its products gained through research, reports, scientific literature and other available methods. It must, when reasonable, take such steps as are reasonably necessary to bring that knowledge to the attention of those foreseeably exposed to its products; that is, it must take reasonable steps to adequately warn them. In deciding what is reasonable you may consider the special circumstances of the case including the degree of hazard and whether it would reasonably be expected to be known to the user, the likelihood and severity of harm, and the feasibility of actually getting a warning to the plaintiff and the effectiveness of a warning, and whether the danger was not obvious to the user and whether the product causes immediate symptoms. A manufacturer does not have a duty to warn the user of a danger obvious to the user.

The duty to warn extends to dangers or defects about which the manufacturer either actually knew or should have known. "Should have known" means that a manufacturer is held to that level of knowledge which knowledge people in the particular industry had, and in view of the state of medical and scientific knowledge, and technology in general, and in the manufacturer's own experience in particular, reasonably should have had at the time the product was marketed. You may consider what was known or should have been known about the dangers of the product and the effects of a failure to take adequate precautions in its use.

You must decide, based on all the evidence that you have heard and seen during this trial, whether the plaintiff has proved that the defendant actually was, or should have been aware that its products, when used as the manufacturer would reasonably foresee that products would be used, could cause injury to those who used the products.

The precise disease suffered by a plaintiff need not have been foreseeable by the defendant. It is sufficient that the defendant knew or should have known that some serious injury could result from use of its products.

Each plaintiff had a right to decide for herself whether to work and what she would require as protection before continuing to work. The fact that another worker might have done the job does not negate the obligation of the defendant to a particular worker. If, however, as defendant claims, a plaintiff would have done her work the same way whether or not the defendant gave warnings, then there was no cause of the injuries from the failure to warn.

You may find that a warning must specifically and clearly identify each of the potential dangers involved in the products' uses including those dangers which might affect only some users, but not all users.

A defendant's duty to use reasonable care in giving adequate warning is nondelegable. That means that a defendant may not rely on others to issue an adequate warning. It was the duty of defendant to issue warnings, if any, that you find were necessary to those who might be exposed to the defendant's products.

The duty to warn does not terminate when an item produced by the manufacturer is sold. It continues to exist and be a responsibility of a defendant even after the product was sold, if it becomes known or reasonably should have become known to the manufacturer that persons who use the product may be harmed.

### 2. Application of Law to Facts

Plaintiffs produced sufficient evidence to make out a classic product liability case for failure to warn under New York law. They successfully persuaded the jury to find in their favor on all of the elements of such a case. Based on the evidence, the jury could have found that: defendant had a duty to plaintiffs to warn of the dangers inherent in its product, the LK201 keyboard; defendant breached that duty by not issuing appropriate warnings; and defendant's failure to warn was the proximate cause of all three plaintiffs' RSIs.

## D. Statute of Limitations

### 1. Law

With the exception of certain specified actions not relevant in the instant case, person-

al injury suits in New York must be commenced within three years from the date of injury. *See* CPLR §§ 214, 214–a, 214–b, 214–c, 215. "The time within which an action must be commenced ... shall be computed from the time the cause of action accrued to the time the claim is interposed." CPLR § 203, *See, e.g., Dorsey v. Apple Computers, Inc.*, 936 F.Supp. 89, 90 (E.D.N.Y.1996).

At the time of the *Dorsey* decision, there was uncertainty about what constitutes "the time of injury" in RSI cases:

> When does the statute of limitations begin to run in a products liability action in which plaintiff's continued use of a keyboard has caused "repetitive stress" injuries ("RSI") or carpal tunnel syndrome? Divergent decisions have been reached by the Appellate Divisions of the Fourth and First Departments. Interestingly, both courts purportedly apply the traditional "date of injury" rule, but with somewhat different results.

Vincent C. Alexander, Supplementary Practice Commentaries, 7B Civil Practice Law and Rules 116 (McKinney 1990 & Supp.1997) (discussing *Piper v. International Business Machines Corp.*, 219 A.D.2d 56, 639 N.Y.S.2d 623 (4th Dep't 1996) and *Blanco v. American Tel. & Tel.*, 223 A.D.2d 156, 646 N.Y.S.2d 99, *reh'g denied, leave to appeal granted,* 234 A.D.2d 239, 652 N.Y.S.2d 503 (1st Dep't 1996) (Mem.) currently pending before the Court of Appeals). Because the Court of Appeals "has not yet ruled .... [i]ts view must be predicted." *Dorsey v. Apple Computers, Inc.*, 936 F.Supp. 89, 90 (E.D.N.Y.1996) (citations omitted).

■ If any plaintiff had suffered a new injury subsequent to her initial injury, any claims based on the later injury could be filed within three years of that later injury. New York's two-injury rule controls in such cases:

> New York courts recognize that a single causal agent or event may produce two diseases [that] are separate and distinct. Each disease may give rise to its own cause of action.... Under the [two-injury] rule, diseases that share a common cause may nonetheless be held separate and distinct where their biological manifestations are different and where the pres-

ence of one is not necessarily a predicate for the other's development.

*In re Breast Implant Cases,* 942 F.Supp. 958, 961–62 (S.D.N.Y. & E.D.N.Y.1996) (citations omitted) (internal quotation marks omitted).

The two-injury rule, however, is inapplicable in cases where continued contact with a causal agent leads to a worsening of the original condition rather than a separate and unrelated injury:

> It is a settled principle that once a compensable injury has occurred, the time within which an action may be commenced may not be extended merely by the aggravation, or exacerbation, of that injury by continued contact with the same offending product.

*Coughlin v. International Bus. Mach. Corp.,* 225 A.D.2d 256, 260, 650 N.Y.S.2d 477, 480 (3d Dep't 1996).

■ Plaintiffs filed their suits on March 16, 1994. Defendant's motion for judgment as a matter of law on statute of limitations grounds must be granted with respect to each plaintiff who suffered no new and distinct injury after March 16, 1991. Since all of the injuries in the instant case involved a single injury for each plaintiff that developed over time, the court need not further consider the two-injury rule.

### 2. Application of Law to Facts

#### a. Patricia Geressy

■ According to Ms. Geressy's own testimony, her symptoms of what was later diagnosed as RSI began in the summer of 1991. *See Trial Transcript* at 288. There is no reason to believe that Ms. Geressy was unable to testify accurately as to the first signs of a significant change in her health. The evidence submitted at trial supports a finding of the initial date of injury in the summer of 1991. There are, however, two pieces of evidence that suggest Ms. Geressy experienced RSI related pain and numbness before the summer of 1991. Neither was necessarily sufficient to convince a reasonable juror that her symptoms began earlier.

Dr. Pascarelli testified that "[a]ccording to Mrs. Geressy, she said the first symptoms

began in early 1991. She complained of pain, numbness, tingling in the left hand." *Id.* at 464. When pressed, however, Dr. Pascarelli could identify nothing that suggested that Ms. Geressy sought medical attention for this condition prior to the summer of 1991. *See id.* at 465. His only basis for saying that Ms. Geressy's injuries began in "early 1991," a fairly indeterminate period of time, was his own memory of a conversation with Ms. Geressy. As a matter of law, this nebulous testimony need not be given decisive weight.

The records of Dr. Urs also suggest that Ms. Geressy may have been injured prior to the summer of 1991. These records are more troubling, indicating that Ms. Geressy had been suffering for a year prior to her November 18, 1991 consultation with Dr. Urs. *See id.* at 569. The evidence presented at trial, however, did not require this conclusion since it suggested only an imprecise recording of approximate times that Ms. Geressy had been afflicted. At most, the trial record indicates that Ms. Geressy may have suffered from *de minimus* injury prior to March 1991, although even this possibility could properly have been ignored by the jury.

### b. Jill M. Jackson

 Ms. Jackson has suffered from a number of ailments as far back as the late 1980s. By 1990, Ms. Jackson had begun to experience RSI symptoms in her upper extremities. Testimony and records presented at trial indicate that in 1990, Ms. Jackson sought medical treatment for left elbow pain, "lower back pain, right hip pain after sitting" and pain in her "upper right back shoulder area." *Trial Transcript* at 617, 619. This evidence is fairly consistent (although off by a few months) with Ms. Jackson's initial complaint in which she claimed that "on or about August 1990, [she] began to experience some symptoms such as numbness, tingling, pain and/or sensory motor impairments of the upper extremities, neck and torso." Evidence of Ms. Jackson's 1990 shoulder pain clearly refers to a condition in her upper extremities.

Plaintiff's counsel attempted to distinguish Ms. Jackson's left elbow pain during the 1989–1990 winter from later injuries to the same elbow in an effort to establish that Ms. Jackson experienced new injuries after March 16, 1991, the critical date for statute of limitations purposes. Counsel was unsuccessful.

No possible reasonable analysis of the evidence supports a finding that Ms. Jackson's alleged repetitive stress injuries began any later than 1990. Were they caused by use of defendant's keyboard, she would reasonably have been expected to have been aware of their cause before March 1991. As a matter of law, regardless of later related or aggravated conditions, Ms. Jackson's RSIs (in both left and right upper extremities) first occurred, and her cause of action accrued, before March 16, 1991.

### c. Thomas M. Farrell

 Because Ms. Jackson's claim fails on statute of limitations grounds, the derivative loss of consortium claim filed by her husband, Thomas M Farrell must also fall. *See, e.g., Liff v. Schildkrout,* 49 N.Y.2d 622, 623, 427 N.Y.S.2d 746, 748, 404 N.E.2d 1288, 1291 (1980) ("[A] spouse's cause of action for loss of consortium [does not] exist[ ] in the common law independent of the injured spouse's right to maintain an action for injuries sustained.") (citations omitted), *Rothfarb v. Brookdale Hosp.,* 139 A.D.2d 720, 722, 527 N.Y.S.2d 473, 475 (2d Dep't 1988) (a "loss of consortium . . . cause of action . . . is a derivative one . . ., and thus is governed by the same period of limitations which controls the underlying cause of action") (citations omitted).

### d. Jeannette Rotolo

Ms. Rotolo first used a Digital Keyboard when she began working at Long Island Jewish Medical Center in February 1992. Her first RSI symptoms appeared in April 1993. Defendant recognizes that no statute of limitations can be asserted against this plaintiff.

## E. Injury to Spouse Prior to Marriage

### 1. Law

 A cause of action will not lie for loss of consortium where the injured tort victim

was not married to the plaintiff-spouse at the time of injury. In a case involving a man who married a woman two months after she was injured, a New York court explained the rationale for this rule: "If, at the time of his subsequent marriage, plaintiffs wife was disabled as a result of a previous negligent act by the defendant, the plaintiff took her as his wife in her then existing state of health and thus assumed any deprivation resulting from such disability." *Rademacher v. Torbensen*, 257 A.D. 91, 91, 13 N.Y.S.2d 124, 124 (4th Dep't 1939). It does not matter whether the preexisting injury was observable by the spouse. *See, e.g., Consorti v. Owens–Corning Fiberglas Corp.*, 86 N.Y.2d 449, 450, 634 N.Y.S.2d 18, 18, 657 N.E.2d 1301, 1301 (1995); *Anderson v. Eli Lilly & Co.*, 79 N.Y.2d 797, 798, 580 N.Y.S.2d 168, 169–70, 588 N.E.2d 66, 67–68 (1991).

### 2. Application of the Law to the Facts

Ms. Rotolo's RSI first manifested in April 1993. She married John William Rotolo on May 15, 1993. He may not recover for her prior injury. His claim for lost consortium must be dismissed.

### F. Deviation of Verdict

### 1. Law

Because the court of appeals may differ from the trial court on the issue of a new trial and require reinstatement of the verdicts, the appropriateness of the amount of the verdicts should be assessed.

Historically, New York courts, like those in the federal system and the majority of jurisdictions in the United States, applied a "shock the conscience" standard to determine the possible excessiveness or insufficiency of jury awards. In 1986, in an effort to curb escalating awards, the New York legislature created a statutory standard designed to give courts greater discretion in monitoring verdicts. *See Legislative Findings and Declarations*, 1986 N.Y. Laws 470 (McKinney). The statute provided a new standard for judicial review of jury awards— "deviates materially from what would be reasonable compensation." In relevant part it reads:

> In reviewing a money judgment.... in which it is contended that the award is excessive or inadequate and that a new trial should have been granted unless a stipulation is entered to a different award, the appellate division shall determine that an award is excessive or inadequate if it *deviates materially from what would be reasonable compensation.*

CPLR 5501(c) (emphasis added). These last eight words, and in particular, the two phrases *deviates materially* and *reasonable compensation* provide a more complex challenge to a federal trial court than first meets the eye.

"This legislation was apparently intended to relax the former standard of review and to facilitate appellate changes in verdicts." *O'Connor v. Graziosi*, 131 A.D.2d 553, 554, 516 N.Y.S.2d 276, 277 (2d Dep't 1987) (citations omitted). Courts and commentators alike have understood the new language as providing courts with much greater latitude than the former *shock the conscious* standard for reviewing and altering jury awards. Summarizing New York state law, the Supreme Court recently stated:

> New York state-court opinions confirm that § 5501(c)'s "deviates materially"; standard calls for closer surveillance than the "shock the conscious" oversight.... The "deviates materially" standard ... in design and operation, influences outcomes by tightening the range of tolerable awards.

*Gasperini v. Center for Humanities*, 518 U.S. 415, –– – ––, 116 S.Ct. 2211, 2218–19, 135 L.Ed.2d 659 (1996). *See also Baumgarten v. Slavin*, No. 9018/84, slip op. at 3 (Sup.Ct. Nas. County May 6, 1997) ("The 'deviates materially' standard calls for much closer scrutiny of the size of jury awards than the old 'shocks the conscience' test."), discussed *in* Cerisse Anderson, *$5 Million Pain and Suffering Award Upheld*, N.Y.L.J, May 13, 1997, at 1. Professor David D. Siegel, a leading scholar on New York civil procedure, has written that "[t]he amendment invites the appellate division's alteration of the [jury] verdict on the presumably lighter finding that the award 'deviates materially from what would be reasonable com-

pensation.'" David D. Siegel, New York Practice 617 (2d ed.1991).

The enlarged power of review, although directed at the state intermediate appellate courts, applies to federal trial courts that must follow the same standard in evaluating jury verdicts. In diversity cases and other cases applying state substantive law, federal courts may do so without violating the Seventh Amendment. *See, e.g., Gasperini,* 518 U.S. at ——, 116 S.Ct. at 2218 ("Although phrased as a direction to New York's intermediate appellate courts, § 5501(c)'s 'deviates materially' standard, as construed by New York's courts, instructs state trial judges as well."); *Ashton v. Bobruitsky,* 214 A.D.2d 630, 631, 625 N.Y.S.2d 585, 586 (2d Dep't 1995) ("The trial court ha[s] the power . . . to set aside [the jury verdict] if it f[i]nd[s] that the verdict deviated materially from what would be reasonable compensation.") (citations omitted); *see also* David D. Siegel, New York Practice 77 (2d ed. 1991 & Supp.1996) ("Recent decisions appear to acknowledge the futility of having a trial court, in assessing a legal maximum or minimum for damages, apply a standard different from that which would be applied on appellate review, and indicate that the trial court should also apply the 'deviates materially' standard—applicable in terms only to the appellate division under CPLR 5501(c)—instead of the older 'shocks the conscious' standard").

There are two major stumbling blocks for federal courts applying the New York statute. First, the role of a federal court sitting in diversity is controlled both by state law under Erie and sometimes conflicting federal law under the Seventh Amendment to the Constitution. Second, a federal court with relatively limited experience in applying state tort law and evaluating state tort verdicts must acquire a sense for what New York courts would do under the circumstances.

The *Gasperini* Court resolved the constitutional conflict in favor of *Erie.* As to the duty of federal courts to act as if they were state courts, it noted that "[t]o determine whether an award 'deviates materially from what would be reasonable compensation,' New York state courts look to awards approved in similar cases." *Gasperini,* 518 U.S. at ——, 116 S.Ct. at 2218.

State courts at both the trial and appellate levels are well-situated to gauge which jury awards *deviate materially* and which do not. Unlike federal courts they see hundreds of tort cases every year. In New York's Second Department (which corresponds geographically to the area covered by the Eastern District of New York), 46,325 and 48,326 tort cases were filed in state courts in 1995 and 1996, respectively. *See* Memorandum on Statistics on Tort Litigation in the Second Department from the Clerk of the Court, Eastern District of New York, to the Chambers of Senior District Judge Jack B. Weinstein, January 30, 1997, at 2. Notices of appeal were filed in 2,592 and 2,913 cases again in 1995 and 1996, respectively. *See id.* at 1. Although less than half of the appeals filed were perfected, the Appellate Division for the Second Department could expect to see over 1,000 cases each year. *See id.* (Note that the state statistics include both jury and bench trials.) It is much easier for state judges to evaluate jury verdicts. They can look at their own records and rely on institutional know-how.

In the Eastern District of New York, in contrast, only 1,152 and 1,298 tort cases were filed in 1995 and 1996, respectively. *See* Memorandum on Statistics on Tort Litigation in the Second Department from the Clerk of the Court, Eastern District of New York, to the Chambers of Senior District Judge Jack B. Weinstein, January 27, 1997, at 2 (for 1995 statistics); Memorandum from the Administrative Office of the United States Courts Statistics Division, Analysis and Reports Branch to the Clerk of the Court, Eastern District of New York, January 27, 1997, at 2–3 (for 1996 statistics) (Administrative Office Memorandum). Almost all of these cases settle without trial. Usually the court is not aware of the amount of settlement. Only 40 cases in 1995 and 35 cases in 1996—divided among some thirty district judges and magistrate judges—resulted in jury verdicts. See Administrative Office Memorandum at 4–12. Federal courts sitting in diversity and applying New York substantive law lack the institutional experience of state courts which

must routinely review verdicts under the *deviates materially* standard. Without the expertise of state courts, federal courts applying the *deviates materially* standard must chart an independent course to arrive at a comparable result.

Each experience of human suffering is unique. The reverberations from a tragic event are not necessarily any more intelligible or quantifiable through an examination of other peoples' suffering. And yet, considering comparable injuries is a necessary first step for any court attempting to develop a sense of *reasonable compensation* under the circumstances. CPLR 5501(c) forces the court into the awkward position of attempting to do what the tort victim cannot—analyze, classify and (implicitly) rank the affliction of one tort victim against that of another. In one sense this is an impossible endeavor. To measure the impact of a tragedy in the life of one person vis-a-vis another is beyond judicial (and perhaps human) capacity. Yet, if the courts are to administer a fair and just tort system, they must work out methods, however imperfect, for evaluating and entering tort judgments under *Gasperini.*

Theoretically, courts have a straightforward basis from which to begin this analysis. *Reasonable compensation* is compensation that would make a plaintiff *whole*, as if he or she had never suffered the injury. *See, e.g., McDougald v. Garber,* 73 N.Y.2d 246, 253–54, 538 N.Y.S.2d 937, 939, 536 N.E.2d 372, 374 (1989) (The purpose of "an award of damages to a person injured by the negligence of another is to compensate the victim.... The goal is to restore the injured party, to the extent possible, to the position that would have been occupied had the wrong not occurred."). Compensatory damage awards include a number of components, only some of which lend themselves easily to this process. There are quantifiable damages such as lost earnings and past medical bills, more speculative awards for predicted future lost earning capacity and costs associated with injuries, and, finally, non-economic awards for the intangible emotional experience of a life marred by a tortious event.

Attempts to make the plaintiff whole through money damages are acts of legal fiction which cannot mask the ultimate powerlessness of money to replace what an individual has lost in suffering the unalterable consequences of an injury. The New York Court of Appeals acknowledges that:

> An economic loss can be compensated in kind by an economic gain; but recovery for noneconomic losses such as pain and suffering and loss of enjoyment of life rests on the legal fiction that money damages can compensate for a victim's injury. ... We accept this fiction, knowing that although money will neither ease the pain nor restore the victim's abilities, this device is as close as the law can come in its effort to right the wrong. We have no hope of evaluating what has been lost, but a monetary award may provide a measure of solace for the condition created....

*McDougald v. Garber,* 73 N.Y.2d 246, 254, 538 N.Y.S.2d 937, 939–40, 536 N.E.2d 372, 374–75 (1989).

Courts must not only determine sufficient monetary compensation to assuage non-monetary suffering, but they must also identify the upper limit beyond which a compensatory award cannot go. As the Court of Appeals has noted, "Our willingness to indulge in this fiction [making the tort victim whole] comes to an end ... when it ceases to serve the compensatory goals of tort recovery." *Id.* Another court has echoed similar concerns:

> [T]he law does not permit a jury to "abandon analysis for sympathy for a suffering plaintiff and treat an injury as though it were a winning lottery ticket.... Rather, the award must be fair and reasonable, and the injury sustained and the amount awarded rationally related. This remains true even where intangible damages, such as those compensating a plaintiff for pain and suffering, cannot be determined with exactitude."

*Taylor v. National R.R. Passenger Corp.,* 868 F.Supp. 479, 484 (E.D.N.Y.1994). A non-judicial observer, writing on the old *shock the conscious* standard, expressed concerns about boundless pain and suffering awards:

The amount of money that a court or a jury will award ... for pain and suffering [is] unpredictable and, in some cases, may bear no reasonable relationship to a plaintiff's actual economic injury. Juries awarding damages for pain and suffering [under the *shock the conscious* standard] have virtually unbridled discretion, as there is currently no meaningful way to measure such non-quantifiable losses monetarily.

Leslie A. Rubin, Note, Confronting a New Obstacle to Reproductive Choice: Encouraging the Development of RU–486 Through Reform of Products Liability Law, 18 N.Y.U. Rev. L. & Soc. Change 131, 146 (1990–1991).

Courts have at their disposal methods for reviewing the portion of compensatory awards that address economic loss, but the non-economic portion has remained intransigent. The New York legislature intended CPLR 550 1(c) as a solution, but the quandary resists solution by the mere replacement of the *shock the conscious* standard with the *material deviation* standard.

CPLR 5501(c)'s conception of *reasonable compensation* cannot exist in a vacuum. There needs to be some point of reference. With economic damages, the court may rely on traditional methods of economic analysis. As for the non-economic pain and suffering award, the reviewing court must begin by identifying some group of similar cases to serve as a referent. This task is difficult, particularly in cases exploring relatively new types of injuries and claims such as those in the instant case involving RSI claims against a keyboard manufacturer. Cases with similar causal agents, similarly-named diagnoses, or similar reductions in quality of life might serve as benchmarks.

The pain and suffering award requires an assessment of a plaintiff's emotional and physiological responses to the injury, including such factors as "fright, anxiety, nervousness, worry, shock, humiliation, embarrassment [and] terror...." Comment, Loss of Enjoyment of Life as a Separate Element of Damages, 12 Pac. L.J. 965, 971–72 (1981). This kind of analysis does not easily lend itself to objective comparison. As the Second Circuit has observed, "measuring pain and suffering in dollars is inescapably subjective." *Gibbs v. United States,* 599 F.2d 36, 39 (2d Cir.1979). There is an inherent difficulty in considering such disparate factors as a plaintiff's "ability to dance, bowl, swim, or engage in similar recreational activities, inability to perform customary chores [,] and ... to engage in the usual family activities." *Downie v. United States Lines Co.,* 359 F.2d 344, 347 n. 3 (3d Cir.1966).

Plaintiffs differ. Some are more susceptible to pain than others. Some may be younger, perhaps more deserving in the jury's view, or more vulnerable, or may have led a more difficult life or an easier one. There is an infinite variety of people and reactions to tragedy, further compounding the difficulty of quantifying verdicts.

Even with seemingly objective criteria, such as measurements of the amount of time that a tort victim suffers, different juries produce a seemingly erratic set of verdict data. One scholar in this field, Dean David W. Leebron, attempted to finding a correlation between time suffered and the amount of the award. In his research, he was unable to discover any rationale for jury awards for pain and suffering. Dean Leebron found that "the temporal element of the pain and suffering has no statistically significant effect for durations from half a minute up to one week." David W. Leebron, Final Moments: Damages for Pain and Suffering Prior to Death, 64 N.Y.U.L.Rev. 256, 294 (1989). He concluded, "[t]ort awards ... vary significantly and ... neither the specific facts of the case nor differing views of the functions of the awards can explain such variation." *Id.* at 259. *See also* Oscar G. Chase, Helping Jurors to Determine Pain and Suffering Awards, 23 Hofstra L.Rev. 763, 768 (1995) ("Both anecdotal and empirical evidence indicates that the disparity between awards for pain and suffering among apparently similar cases defies rational explanation.").

Within the same state verdicts vary widely by geographic area. As Justice Edward T. O'Brien recently observed:

It is curious that awards for pain and suffering on one side of the East River are uniformly two and three times higher than

on the other. Is it that the composition of the two respective communities are so different? I think not....

*Baumgarten v. Slavin,* No. 9018/84, slip op. at 3 (Sup.Ct. Nas. County May 6, 1997) quoted in Cerisse Anderson, *$5 Million Pain and Suffering Award Upheld,* N.Y.L.J, May 13, 1997, at 1. State verdicts vary widely even in the Eastern District of New York depending on the county in which the case is tried.

▮ However inexact, the process for determining the category of award that is a *material deviation* may be undertaken in three steps. First, identify the normative group—what kinds of cases are sufficiently similar to serve as the referent group for determining what is *reasonable?* Second, determine what constitutes a deviation from that group. Third, define statistically and intuitively how far a verdict can deviate before that deviation becomes material. After this three step analysis, the court reviews the more traditional examination of economic damages and the statistical analysis for non-economic damages and decides how much leeway should be allowed the fact finders before determining that a jury verdict *deviates materially.*

### a. Identifying the Normative Group for Comparison

Holding a post-trial *Gasperini* hearing is the initial step. The parties provide experts (subject to the court's power to appoint Rule 706 independent experts) who can assist the court in identifying appropriate comparative cases. Such a hearing is by no means ideal. The court does not have the capacity or the time to go through possibly scores of records in order to see what is equivalent. It has to have the information summed up in some convenient way. This is much the same task it undertakes in determining land values from comparable sales (a more developed technique). *Cf.* 1 Lewis Orgel, Valuation Under the Law of Eminent Domain §§ 136–140 (2d ed.1953); Stephen H. Kalos and Jonathan D. Putnam, *On the Incomparability of 'Comparables': An Economic Interpretation of 'Infringer's Royalties',* 9 J. of Proprietary Rts., Apr. 1997, at 2.

▮ Similar injuries or diagnoses are primary (but not controlling) criteria in choosing sufficiently analogous cases. In evaluating the pain and suffering that results from a tortious event, the court also may consider the causal agent itself and the circumstances surrounding the injury in determining the nature of the anguish for which plaintiff should be compensated. The life changes that follow the tortious event are also of critical importance. If at all possible, cases within the relevant venue should be relied upon because the farther the court moves beyond the place of trial, the more likely it is that community conceptions of reasonableness diverge in various directions.

In determining whether an award is reasonable, it is almost impossible to find cases for comparison where all relevant factors are identical to those in the case under consideration. Rather, the court must review the totality of the circumstances of the proffered sample cases to ascertain whether they can provide a basis for comparison. There are almost no "all fours" cases. As Appendix A indicates the decisions on comparability are somewhat arbitrary. The court's evaluation may be supplemented by expert testimony of practitioners and others familiar with state tort cases.

### b. Deviation from the "Normal" Group

Once the court has chosen a group of settlements and verdicts with which to compare the verdict under consideration, there is no simple method for determining whether that verdict is reasonable vis-a-vis those in the normative group. The imprecision inherent in simply making a vague estimate by looking at a comparative group turns the court toward a statistical analysis.

▮ The initial step in considering whether a jury verdict is reasonable as compared to settlements and verdicts in other cases is to determine the variance within the group. "Statisticians use several statistics to measure the amount of variation within a data set." James Brook, A Lawyer's Guide to Probability and Statistics 24 (1990). "[T]he statistic most often seen as a measure of variation within a data set is the *standard deviation.*" *Id.* at 25. *See also, e.g.,* The Evolving Role of Statistical Assessments as

Evidence in the Courts 88 (Stephen E. Fienberg ed.1989) (discussing *Castaneda v. Partida,* 430 U.S. 482, 496, n. 17, 97 S.Ct. 1272, 1281 n. 17, 51 L.Ed.2d 498 (1977)).

Even though the entire enterprise is expected to provide only a rough approximation, close to an intelligent and well-informed guess, the court is well advised to rely on sophisticated statistical experts. *See generally, e.g.,* Michael O. Finklestein & Bruce Levin, Statistics for Lawyers 46 (1990); The Evolving Role of Statistical Assessments as Evidence in the Courts 36, 91 (Stephen E. Fienberg ed.1989) (two or three standard deviations, one or two tailed hypotheses).

The discussion which follows is illustrative only. In the instant case the statistical analysis provided by the parties, and largely relied upon in this memorandum, was not satisfactory to the court. Should it actually become necessary to fix the appropriate range of verdicts a full hearing and a more comprehensive statistical analysis will be required. *See, e.g.,* David H. Kaye & David A. Freedman, *Reference on Statistics, in* Reference Manual on Scientific Evidence 331 (Fed. Jud.Ctr. ed.1994); The Evolving Role of Statistical Assessments as Evidence in the Courts 91 (Stephen E. Fienberg ed. 1989) ("The methodologies of the experts show increasing complexity, but the comprehension of the judges has clearly not kept apace.").

### c. Defining *Material Deviation*

The court may use the dollar amount to measure, by standard deviation, how far past settlements or verdicts for pain and suffering have varied from the *mean* settlement or verdict. "The *mean* of a set of observations is the value obtained by summing all the observations and dividing by the number of observations." R. Kapadia & G. Anderson, Statistics Explained: Basic Concepts and Methods 68 (1987). Approximately two-thirds of the values under a normal distribution, a symmetrical bell-shaped curve, fall within one standard deviation of the mean, and approximately 95% fall within two standard deviations of the mean. David H. Kaye & David A. Freedman, *Reference on Statistics, in* Reference Manual on Scientific Evidence 331, 379 (Fed.Jud.Ctr. ed.1994). The data available in the instant case did not

generate a symmetrical bell-shaped curve, but for the purposes of this memorandum, it is assumed that classic statistical analysis of such curves is appropriate. Expert statisticians will have to assist the court in dealing with curves that dive off sharply at the lower end, where the limit is zero, while tailing off into what are often very high figures at the upper end.

■ There are arguments supporting a rule for *Gasperini* purposes of one, two or more standard deviations. Using two standard deviations to define the group of values that constitute *reasonable compensation* supports the judiciary's efforts to sustain jury verdicts whenever reasonably possible. This approach is consistent with the federal and New York state constitutions that guarantee the right to trial by jury in civil cases. *See* U.S. Const. amend. VII; N.Y. Const. art. I, § 2. Narrowing the range to figures that fall within one standard deviation, however, speaks to the state policy of controlling jury verdicts. See Legislative Findings and Declarations, Ch. 266, 1986 N.Y. 470 (McKinney). Given the awards in the instant case, and subject to reconsideration on advice of experts, a two standard deviation rule seems appropriate.

Settlements and jury verdicts do not, unfortunately, seem to fall along a normal distribution curve. When there are many more extreme values on one side of the mean than the other, as there usually are with pain and suffering awards, statisticians must consider the issue of *skew:*

> [An] aspect of the data which statisticians often will want to check and report on is the degree to which the data set does or does not exhibit symmetry about a central value. The word that is used to characterize this degree of symmetry or lack thereof is the *skewness* of the data set.

James Brook, A Lawyer's Guide to Probability and Statistics 27 (1990). Because of the skew in the instant case, the *median* value which is the middle value in a distribution, above and below which lie an equal number of values furnishes a critical figure. The median value conveys, in many ways, more useful information than the mean because it

is not as drastically affected by skew and therefore may provide a more representative picture of the typical award. As one statistics text explains:

The choice [between using the mean and the median value] depends on the data which are being analyzed.... For interval data the mean is usually appropriate unless the distribution is skewed with a few rather extreme values either below or above the common values. Extreme values, which are not representative of the distribution as a whole, have a significant effect on the mean, but not on the median. It is for this reason that the median is often used instead of the mean with skew distributions....

R. Kapadia & G. Anderson, Statistics Explained: Basic Concepts and Methods 74 (1987).

There appears to be agreement between plaintiffs and defendant on the desirability of using the median rather than the mean as a starting point. Plaintiff's expert, Arnold Lakind, testified as to his preference for using a median value in evaluating settlements and jury verdicts. Mr. Lakind testified that "[t]he median is a better measure [than the mean for making an] assessment of ... top verdicts." *Gasperini Hearing Transcript* at 87–88. Defendant has also argued that "the *median* is the more meaningful value." *Letter from Defendant's Counsel to the Court,* March 5, 1997 at 4.

No attention was given to the problem of defining when verdicts were too low. Zero defines the outer limit of such verdicts whereas the sky is the limit of what juries have awarded on the high side. No fixed a priori statistical rules by the court seem warranted at this stage of *Gasperini* development. In time, a sophisticated literature and precedents may develop. For present purposes, it is assumed that there are no extraordinary factors that distinguish the case at bar from other cases in the normative group and that the pain and suffering award should fall within two standard deviations. Applying this assumption, a pain and suffering award that falls outside these ranges should be raised or lowered to reach the low or high number that marks off either end of the range. *Cf. Watson v. Fort Worth Bank and Trust,* 487 U.S. 977, 995 n. 3, 108 S.Ct. 2777, 2789 n. 3, 101 L.Ed.2d 827 (1988) ("Courts have also referred to the 'standard deviation' analysis sometimes used in jury-selection cases.... We have emphasized the useful role that statistical methods can have in Title VII cases, but we have not suggested that any particular number of 'standard deviations' can determine whether a plaintiff has made out a prima facie case in the complex area of employment discrimination.... Nor has a consensus developed around any alternative mathematical standard. Instead, courts appear generally to have judged the 'significance' or 'substantiality' of numerical disparities on a case-by-case basis.... At least at this stage of the law's development, we believe that such a case-by-case approach properly reflects our recognition that statistics come in infinite variety and their usefulness depends on all of the surrounding facts and circumstances.") (citations omitted) (internal quotations omitted); *Ballew v. Georgia,* 435 U.S. 223, 237–39, 98 S.Ct. 1029, 1038–39, 55 L.Ed.2d 234 (1978) ("Studies that aggregate data also risk masking case-by-case differences in jury deliberations".... [S]tudies ... lead us to conclude that the purpose and functioning of the jury in a criminal trial is seriously impaired, and to a constitutional degree, by a reduction in size to below six members. We readily admit that we do not pretend to discern a clear line between six members and five. But the assembled data raise substantial doubt about the reliability and appropriate representation of panels smaller than six. Because of the fundamental importance of the jury trial to the American system of criminal justice, any further reduction that promotes inaccurate and possibly biased decisionmaking, that causes untoward differences in verdicts, and that prevents juries from truly representing their communities, "attains constitutional significance.") (citations omitted) (footnotes omitted); *Castaneda v. Partida,* 430 U.S. 482, 496 n. 17, 97 S.Ct. 1272, 1281 n. 17, 51 L.Ed.2d 498 (1977) ("If the jurors were drawn randomly from the general population, then the number of Mexican–Americans in the sample could be modeled by a binomial distribution.... The important point, how-

ever, is that the statistical model shows that the results of a random drawing are likely to fall in the vicinity of the expected value.... The measure of the predicted fluctuations from the expected value is the standard deviation, defined for the binomial distribution as the square root of the product of the total number in the sample ... times the probability of selecting a Mexican–American ... times the probability of selecting a non-Mexican-American.... [I]n this case the standard deviation is approximately 12. As a general rule for such large samples, if the difference between the expected value and the observed number is greater than two or three standard deviations, then the hypothesis that the jury drawing was random would be suspect to a social scientist." (citations omitted)); *Hazelwood School Dist. v. United States*, 433 U.S. 299, 311 n. 17, 97 S.Ct., 2736, 2743 n. 17, 53 L.Ed.2d 768 (1977) (holding that "a fluctuation of more than two or three standard deviations would undercut the hypothesis" of race-neutral hiring in St. Louis school district) (citations omitted). For a critical explanation of the cases, *see generally* The Evolving Role of Statistical Assessments as Evidence in the Courts *passim* (Stephen E. Fienberg ed.1989).

Statistical analysis alone can never be controlling. The court must always exercise independent discretion in its review of statistics. The three step analysis is meant merely to provide a guide in this nebulous area of tort law.

#### d. Burden of Proof

■ Before moving on to apply a statistical test to determine material deviation, one final issue must be addressed: the burden of proof at a *Gasperini* hearing. While there is no definitive case law on the burden of proof in applying section 5501(c)'s *deviates materially* standard, an analysis of the federal standard for granting a new trial combined with a review of CPLR 5501(c) can be of assistance.

A general assumption under the Constitution that jury verdicts should stand unless there is a good reason to modify them, strongly suggests that the burden of proof should lie with the party challenging the verdict. Without choosing a preponderance or a clear and convincing standard, it is enough to say for present purposes that the trial judge should feel an assurance that the verdict lies beyond the pale of non-material deviation before it is rejected. *See, e.g.,* Vern R. Walker, *Preponderance, Probability and Warranted Factfinding*, 62 Brook. L.Rev. 1075 (1996).

#### 2. Application of Law to Facts

While judgment in favor of only one of the three RSI plaintiffs is entered, all three verdicts are reviewed as illustrative of a *Gasperini* approach. Based on the analysis supplied by the parties, and subject to further consideration should there be a remand on this issue, a two standard deviation rule is applied.

#### a. Patricia Geressy

■ Early in the *Gasperini* hearing, defense counsel disputed Ms. Geressy's comparison of her own case to others involving those diagnosed with reflex sympathetic dystrophy (RSD). Defendant argued that such cases did not provide a useful basis for comparison because "[t]here is no evidence in the case ... that [Ms. Geressy] was diagnosed with reflex sympathetic dystrophy [with] a reasonable degree of medical certainty." *Gasperini Hearing Transcript* at 13. This issue, as embodied in the disagreement over this diagnosis and its relevance, provides a starting point for considering the factors involved in choosing comparison cases in individual litigations. In determining general rules for constructing a normative group, the question of whether similar diagnoses, similar symptoms, or other criteria should control must be considered. RSD provides a paradigmatic example of the difficulty in applying *Gasperini*. *See* Timothy J. Walsh, *Reflex Sympathetic Dystrophy Syndrome*, 19 Am.Jur. Proof of Facts 179 (1993). Walsh describes the symptoms of this pain syndrome in the context of discussing litigation strategies:

Reflex sympathetic dystrophy (RSD) is a collection of signs and symptoms resulting from a disturbance in function of the automatic nervous system of a limb or part of a limb, on a reflex (involuntary and self-perpetuating) basis. The IASP [Interna-

tional Association for the Study of Pain] has defined RSD as "continuous pain in a portion of the extremity after trauma which may include fracture but does not involve a major nerve and is associated with sympathetic hyperactivity."

*Id.* at 187 (citations omitted). The nature and symptoms of this syndrome are described as follows:

RSD may follow major or minor injury. The primary symptom is pain of a severe, burning nature in an extremity. This pain is constant. Moving or touching the limb is often intolerable. At first pain is likely to be localized at the injury site, but with time it spreads to the entire extremity and to other parts of the body. There are also vasomotor changes, including "vasoconstriction" (swelling, cyanosis, and cool skin). Other autonomic disturbances include "hyperhidrosis" (excessive perspiration), trophic changes in the skin and muscles, and osteoporosis. The entire symptom complex is rarely present in any one patient. Instead, one or more of the individual symptoms usually predominate.

*Id.* at 190 (citations omitted). "The elements of damages in an action involving reflex sympathetic dystrophy are the same as the elements of damages in personal injury actions generally.... A major portion of the damages for any permanent impairment may involve an attendant loss of the 'ability to enjoy life.' " *Id.* at 208 (citations omitted).

Defendant has suggested that comparing the Geressy verdict with RSD cases without a sufficiently certain RSD diagnosis is improper. The argument is not convincing. Except perhaps when the disease itself has especially frightening connotations, such as cancer, it is the symptoms that hurt. In some situations, it is the symptoms themselves, and not the name of the disease *per se,* that must be attested to with a reasonable degree of medical certainty. Where treating physicians are available to testify in depth and present a catalogue of medical records to support their testimony, determining the existence (or its lack) of a series of painful medical symptoms and their probable discomforting sequelae is well within the purview of the jury. The plaintiff can describe her symptoms even if she cannot name her disease.

The comparison between Ms. Geressy and a tort victim with a confirmed case of RSD is appropriate, for the lay jury is more trained to appreciate symptoms than to differentiate diagnoses. Many of the causal events, symptoms, medical treatments, and life consequences are similar. With respect to the proffered RSD cases, the plaintiff's figures are persuasive as to comparable verdicts.

Accepting plaintiff's proffered RSD cases as providing a sound font from which to draw verdicts to form the normative group does not end the inquiry. While the RSD cases cited by plaintiff appropriately focus on the debilitating effect of the injuries on Ms. Geressy's life, there are a few comparable cases offered by plaintiff that are clearly inapposite. A few misleading ones illustrate the appropriate decision making process. Plaintiff, for example, suggested *Summerville v. City of New York,* No. 39604/91 (Sup.Ct. Kings County 1996), as useful. In that case,

[Plaintiff,] a 30–year–old maintenance worker [and innocent hapless bystander] was shot by an off-duty New York City Police sergeant during a bank robbery. .... His shots struck [plaintiff], a bystander who was on an errand for his employer, in the left arm and back. The officer later claimed that [plaintiff] had approached him and pointed an object, which he believed to be a gun. Evidence indicated that [plaintiff] did not have a gun in his possession after the incident, and that the only object that he had was a wallet. Witnesses testified that [plaintiffs] hands were raised and empty when he was shot.... [Plaintiff suffered] gunshot wounds to the left (nondominant) arm, stomach, and colon. [Plaintiff] claimed that [defendant] allowed his injured left arm to be handcuffed to his hospital bed for 12 hours. He developed reflex sympathetic dystrophy in [his] left arm, which is now paralyzed. He underwent an unsuccessful nerve graft in 1992 in an attempt to restore some function to the arm. A dorsal column stimulator was implanted into his spinal chord in 1995 to relieve the

constant burning sensation to his arm, but this procedure was also unsuccessful. *Defendant's Post–Hearing Affidavit, Jury Verdict Reports,* Exhibit E. Many RSD victims have physical symptoms, emotional traumas leaving long-lasting invisible scars and consequent life changes that are on a similar scale to those experienced by Ms. Geressy. In the bizarre *Summerville* case, however, the RSD diagnosis alone is does not create a useful basis for comparison between the verdict awarded to the *Summerville* plaintiff and Ms. Geressy; they experienced quite dissimilar tortious events, causal agents and resultant life consequences.

Another set of proffered cases that have proved unhelpful involve those of fire aboard flying aircraft, plane crashes and terrorism. Without depreciating the magnitude of the catastrophic nature of Ms. Geressy's illness, plane crashes and terrorist attacks involve qualitatively different tortious events than, and tensions from, those that lead to Ms. Geressy's injuries.

In reviewing cases submitted by plaintiff, a number of different aspects of proffered cases were considered: injuries stemming from work or daily life; medical treatments (including surgeries) that were similar to Ms. Geressy's; similar levels of debilitation from injury; and similar life consequences. There was an ample pool of such New York cases.

The jury awarded Ms. Geressy $5,345,000: $1,855,000 for quantifiable damages and $3,490,000 for pain and suffering. Plaintiff presented sufficient economic analysis at the *Gasperini* hearing to uphold all portions of her award other than that for pain and suffering. The range of comparable verdicts for pain and suffering that fall within two standard deviations from the mean is up to $1,961,119 (rounded to $2,000,000). *See* Appendix B. Since there are no out-of-the-ordinary factors to distinguish Ms. Geressy's case from those of the many tort victims whose verdicts were used to construct the normative group, a jury award for pain and suffering of $3,490,000 (rounded to $3,500,000) "materially deviated from what would be reasonable compensation" under this approach. CPLR § 5501(c). Had the court not granted a new trial based on new evidence, the court would have granted a new trial unless the parties stipulated to a remittitur of $1,500,000 ($3,500,00—$2,000,000) (again, subject to reconsideration at a new hearing aided by statisticians). See Appendix A for the cases that the courts used to construct the normative group, and Appendix B for the breakdown of the jury verdict and the court's statistical analysis of cases from the normative group.

### b. Jill M. Jackson

Ms. Jackson's injuries have required less invasive medical treatments. They have not left her as disabled as Ms. Geressy. Most cases involving extensive surgery and more extreme life consequences were excluded from the normative group used for comparison with Ms. Jackson's award for pain and suffering.

The jury awarded Ms. Jackson $302,-000—$259,000 for quantifiable damages and $43,000 for pain and suffering. Plaintiff presented sufficient economic analysis at the *Gasperini* hearing to uphold all portions of her award other than the pain and suffering award. The range of comparable verdicts for pain and suffering that fall within the two standard deviation range is up to $386,668. *See* Appendix C. Since there are no out-of-the-ordinary factors to distinguish Ms. Jackson's case from those of the many tort victims whose verdicts were used to construct the normative group, under this statistical analysis the jury award of $43,000 could, under some forms of statistical analysis, be said to have "materially deviated [below] what would be reasonable compensation." CPLR § 5501(c). *See* Appendix C (one standard deviation). Nevertheless, considering that the legislation was concerned primarily with reducing excessive awards for pain and suffering, additur—even if permitted under federal practice—would not have been appropriate. This would be a fortiori accurate under a two standard deviation rule. The difference between $43,000 awarded by the jury and even the $59,000 determined by rough statistical analysis using one standard deviation is not so great as to warrant interference with the verdict. Had the court not granted judgment as a matter of law on statute of limitations grounds, it would not

have altered the jury verdict. See Appendix A for the cases that the courts used to construct the normative group and Appendix C for the breakdown of the jury verdict and the court's statistical analysis of cases from the normative group.

### c. Jeannette Rotolo

■ Ms. Rotolo's injuries have required less invasive medical treatments and have not left her as disabled as Ms. Geressy. Most cases involving extensive surgery and more extreme life consequences were excluded from the normative group used for comparison with Ms. Rotolo. Because of the surgeries that she has undergone for her wrists and hands, however, some cases excluded from Ms. Jackson's normative group were included in the construction of Ms. Rotolo's normative group.

The jury awarded Ms. Rotolo $274,000: $174,000 for quantifiable damages and $100,000 for pain and suffering. Plaintiff presented a sufficient argument at the *Gasperini* hearing to uphold all portions of her award. The range of comparable verdicts for pain and suffering that fall within the two standard deviations is 0 to $1,335,192. *See* Appendix D. The jury award of $100,000 did not "materially ̇ deviate[ ] from what would be reasonable compensation." CPLR § 5501(c). The court will enter judgment for Ms. Rotolo for $293,385.88 ($274,000, the jury verdict amount + $19,385.88 for past medical expenses) plus statutory interest. See Appendix A for the cases that the courts used to construct the normative group and Appendix D for the breakdown of the jury verdict and the court's statistical analysis of cases from the normative group.

## IV. CONCLUSION

*Geressy*

As to Patricia Geressy, a new trial is granted on her claims and those of the estate of her husband, Thomas A. Geressy, on the basis of newly discovered evidence. A new trial will be on all issues since the liability finding may have affected the computation of damages. In addition, the statute of limitations issue may not have been fully appreciated by the jury in the light of the un-

revealed tests and other information now available.

If a new trial were not granted, remittitur on the basis of *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996) would probably have been granted after a further statistical hearing.

*Rotolo*

As to Jeannette Rotolo, the jury verdict is sound and fair. There is no basis for a reduction of damages or for a statute of limitations defense. The amount of damages is well within any reasonable jury's range. Credibility factors were for the jury. A motion for a new trial is not conditionally granted under Rule 50(c). The parties should submit within ten days a judgment taking into account past interest and future discount factors under the New York Civil Practice Law and Rules that are not waived. *See also* 28 U.S.C. § 1961.

Ms. Rotolo's husband, John William Rotolo, has no valid loss of consortium claim. He married after his. wife was injured. His claim is dismissed.

*Jackson*

As to Jill M. Jackson, the statute of limitation ran on her claims. The same is true of the claims of her husband, Thomas M. Farrell. On any possible interpretation of the New York statute of limitation, both claims are barred. They are dismissed as a matter of law pursuant to Rule 50(b). A motion for a new trial is not conditionally granted. *See* Fed.R.Civ.P. 50(c).

*Finality as to the Rotolos, Jackson and Farrell*

As to the Rotolos, Jackson and Farrell, the decision is final. No just reason for delay exists. Judgment without costs or disbursements will be granted pursuant to Rules 54(b) and 54(d)(1) of the Federal Rules of Civil Procedure.

*Finality as to Geressy*

As to Geressy, the court is of the opinion that the otherwise non-final, non-appealable order granting a new trial involves controlling questions of law as to which there is substantial ground for difference of opinion

and that an immediate appeal from the order may materially advance the ultimate termination of the litigation expeditiously and fairly. *See* 28 U.S.C. § 1292(b).

Among the issues warranting an immediate appeal are the following:

1. Is there sufficient basis for a finding of liability given the disputed scientific and other factual issues? *See, e.g., Reiff v. Convergent Technologies,* 957 F.Supp. 573 (D.N.J.1997). An included question is: Should a renewed motion for judgment as a matter of law have been granted for defendant pursuant to Rule 50 of the Federal Rules of Civil Procedure?

2. Is there adequate ground for a new trial based on withholding of evidence and newly discovered evidence pursuant to Rule 60(b), Rule 50(b), and Rule 59(a) and (d) of the Federal Rules of Civil Procedure?

3. Should the new trial be on all issues pursuant to Rule 59(a) of the Federal Rules of Civil Procedure?

4. Is the method of computing the maximum damages appropriate under *Gasperini v. Center for Humanities, Inc.,* 518 U.S. 415, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996)? A new trial may obviate the need to decide this issue.

Defendant's application for sanctions for withholding evidence is denied. There is no proof that client or counsel knowingly mislead defendant, defendant's counsel or the court.

Parties are to submit judgments by consent or through separate applications within ten days.

So ordered.

Appendix A

Comparable Cases Considered

| CASE NAME | COMPARE TO GERESSY? | COMPARE TO JACKSON? | COMPARE TO ROTOLO? | PAIN & SUFFERING AWARD | ADDITIONAL INFORMATION |
|---|---|---|---|---|---|
| *Agnostino v. Seaport Unloaders, Inc.,* No. 29008/90 (Sup.Ct. Kings County 1993) | yes | yes | yes | 37,000 | Work related accident causing hand and wrist problems (including an RSI) and necessitating surgery; injury forced plaintiff to change professions. |
| *Annunziato v. Madden,* 0937194 (Sup. Ct. Queens County 1996) | no | no | no | $511,899 | 19 year-old man's intentional dropping of pumpkin from overpass to highway with intention to see pumpkin splatter but without intention to cause personal injury is a qualitatively different tortious event and is not useful for comparison to instant cases. |
| *Baugh v. Reinauer Transp. Co. Inc.* 92–CV–1836 (E.D.N.Y.1994) | yes | no | no | $600,000 | Herniated cervical discs requiring fusion surgery. |
| *Bebee v. City of New York,* 231 A.D.2d 481, 647 N.Y.S.2d 95 (1st Dept.1996) | no | no | no | $875,000 | 27 year-old man suffered paraplegia from gunshot wound; qualitatively different tortious event. |
| *Bernstein v. Red Apple Supermarkets,* 227 A.D.2d 264, 642 N.Y.S.2d 303 (Sup.Ct. 1st Dept.1996) | yes | no | yes | $1,100,000 | Fall by 67 year-old woman. Serious injuries including torn rotator cuff in dominant shoulder. |

| CASE NAME | COMPARE TO GRESSY? | COMPARE TO JACKSON? | COMPARE TO ROTOLO? | PAIN & SUFFERING AWARD | ADDITIONAL INFORMATION |
|---|---|---|---|---|---|
| *Boylan v. Leal*, No. 20766/79 (Sup.Ct. Westchester County 1981) | no | no | no | N/A | Too old and not otherwise useful. |
| *Breslauer v. Dan*, No. 22049/84, (Sup. Ct. Kings County 1990) | no | no | no | N/A | General jury award (followed by a general post-verdict settlement figure) only. |
| *Brust v. Estee Lauder Inc.*, 184 A.D.2d 474, 585 N.Y.S.2d 432 (1st Dept. 1992) | no | yes | yes | $ 238,500 | Plaintiff injured when struck in the upper right arm by a wrench that had been dropped at work site; suffered lacerations to the right arm requiring two sutures and mild right median nerve injury; ability to perform some work duties impaired. |
| *Cohen v. City of New York*, 171 A.D.2d 721, 567 N.Y.S.2d 176 (2d Dept. 1991) | no | no | no | N/A | General damage award only. |
| *D'Amato v. Long Island Railroad*, 874 F.Supp. 57 (E.D.N.Y.1995) | yes | yes | yes | $ 135,000 | Worker suffered RSI injuries for which he underwent two surgeries; took almost a year off work and continued to have pain and hand dysfunction. |
| *Datskow v. Teledyne Continental Motors Aircraft Products*, 826 F.Supp. 677 (W.D.N.Y.1993) | no | no | no | $ 250,000 (per plaintiff) | Plane crash after fire broke out inflight is qualitatively different tortious event. |
| *Doty v. Navistar International Transportation Corp.*, 219 A.D.2d 32, 639 N.Y.S.2d 592 (4th Dept.1996) | no | no | no | $1,500,000 | Amputation of the arm of a 9 yearold boy involves qualitatively different resultant injuries. |
| *Duley v. 888 Seventh Ave. Associates*, 1993 WL 770659 (LRP Jury) (Sup.Ct. New York City 1993) | no | yes | yes | $ 400,000 | Mis-leveled elevator caused office clerk to suffer cartilage tear of the knee, resulting in sympathetic dystrophy and subsequent disability. |
| *Earl v. Bouchard Transportation Co., Inc.*, 917 F.2d 1320 (2d Cir. 1990) | no | no | no | N/A | General damage award only. |

| CASE NAME | COMPARE TO GERESSY? | COMPARE TO JACKSON? | COMPARE TO ROTOLO? | PAIN & SUFFERING AWARD | ADDITIONAL INFORMATION |
|---|---|---|---|---|---|
| *Eschberger v. Conrail,* 174 A.D. 983, 572 N.Y.S.2d 539 (4th Dept.1991) | yes | no | no | $1,700,000 | 49 year-old railway worker injured on the job; two back surgeries and probability of more; herniated disc in cervical spine requiring laminectomy and fusion surgery at C4–5; later fusion surgeries at C3–4 and C5–6. |
| *Farren v. Sherlock,* 1995 WL 778748 (LRP Jury) (Sup.Ct. Chatauqua County 1995) | no | no | no | $ 600,000 | 35 year-old plaintiff suffered the near amputation of both legs, resulting in extensive damage to the left politeal artery and requiring grafting to the artery and the left sciatic nerve; she later developed reflex sympathetic dystrophy; qualitatively different injuries. |
| *Fiebert v. United States,* 91–CV–1439 (E.D.N.Y.1993) | yes | no | no | $ 750,000 | Serious car accident; herniated disc at C–6 requiring fusion surgery. |
| *Figueroa v. Manhattanville College,* 23332/89 (Sup. Ct. Suffolk County 1993) | no | no | no | N/A | General settlement figure only. |
| *Flamio v. State of New York,* 132 A.D.2d 594, 517 N.Y.S.2d 756 (2d Dept. 1987) | no | no | no | N/A | General damage award only. |
| *Forelli v. Pratt Institute,* 181 A.D.2d 856, 581 N.Y.S.2d 832 (2d Dept.1992) | yes | no | no | $ 340,000 | 33 year-old electrician with median nerve injury, complicated by cervical and lumbar injuries including bulging disc. |
| *Furey v. Warren,* No. 1330/91, (Sup. Ct. Putnam County 1993) | yes | yes | yes | $ 75,000 | Plaintiff injured in car accident; injuries included serious RSIs and other complications. |
| *Furgeson v. Boston Buffalo Express,* No. 83/2879 (Sup. Ct. Onondaga County 1984) | no | no | no | N/A | General damage award only. |
| *Guillory v. Nautilus Real Estate,* 208 A.D.2d 336, 624 N.Y.S.2d 110 (1st Dept.1995) | yes | no | yes | $1,200,000 | 52 year-old electrician. Extensive tear of rotater cuff, complicated surgery, 16 months of formal therapy, continuing home therapy, continuing pain and restriction of movement, continuing deterioration and prognosis of further degenerative changes. Traumatic osteoarthritis; can no longer work as an electrician. |

| CASE NAME | COMPARE TO GERESSY? | COMPARE TO JACKSON? | COMPARE TO ROTOLO? | PAIN & SUFFERING AWARD | ADDITIONAL INFORMATION |
|---|---|---|---|---|---|
| *Gulino v. North Carolina Yacht Sales,* No. 5326/90 (Sup.Ct. Suffolk County 1995) | yes | yes | yes | = $149,305.56 | Settlement based on jury verdict and presumably proportionate to jury breakdown; surgeon injured in car accident and suffered RSIs which prevented him from practicing his profession. |
| *Harvey v. Mazal American Partners,* 179 A.D.2d 1, 581 N.Y.S.2d 748 (1st Dept.1992) | no | no | no | $14,300,000 | Plaintiff fell two floors, head-first, which caused permanent damage to brain and spine; qualitatively different injuries. |
| *Heller v. L/M Broadway and 83rd CM Corp.,* No. 21010/88 (Sup.Ct. New York County 1993) | yes | no | no | $ 1,138,834 | Plaintiff was injured at a construction site; suffered herniated cervical discs, requiring disectomy 2 years after the accident; also underwent lumbar laminectomy at L1–2 and resection of his first rib due to thoracic outlet syndrome; required a multi-level spinal fusion; continued to suffer from spinal instability and partial neurogenic impotence. |
| *Hellmann v. State of New York,* No. 70474 (Ct. of Claims Rochester County 1993) | no | yes | yes | $ 129,000 | Inflamed vein and nerve in lower extremities as a result of a work-related accident in prison. |
| *Hildebrandt v. Star Market,* No. 978/84 (Sup.Ct. Monroe County 1984) | no | no | no | N/A | Too old and not otherwise useful. |
| *Hoyt v. Metropolitan Club, Inc.,* No. 14569/91 (Sup. Ct. Bronx County 1996) | no | no | no | N/A | General settlement figure only. |
| *Hubbard v. Tan Tulco,* No. 878/92 (Sup.Ct. Queens County 1994) | no | no | no | N/A | General settlement figure only. |
| *In re In-flight Explosion on Trans World Airlines, Inc.,* 778 F.Supp. 625 (E.D.N.Y. 1991) | no | no | no | varied by plaintiff | Injuries sustained in air plane crashes and terrorist attacks do not provide good comparisons to the injuries in the instant case. |

| CASE NAME | COMPARE TO GERESSY? | COMPARE TO JACKSON? | COMPARE TO ROTOLO? | PAIN & SUFFERING AWARD | ADDITIONAL INFORMATION |
|---|---|---|---|---|---|
| *In re Air Disaster at Lockerbie Scotland*, 887 F.Supp. 71 (E.D.N.Y.1995) | no | no | no | N/A | Injuries sustained in air plane crashes and terrorist attacks do not provide good comparisons to the injuries in the instant case; also, general damage award only. |
| *Jae v. 488 Associates*, No. 1682/83 (Sup. Ct. New York County 1992). | yes | yes | yes | $150,000 | Sculptor suffered bilateral carpal tunnel syndrome and cervical radiculopathy as a result of a fall; could not continue her profession. |
| *Jarvis v. Dianto*, 1993 WL 423466 (LRP jury) (Sup.Ct. Richmond County 1993) | no | no | no | $2,000,000 | Construction worker fell from ladder, became paraplegic and suffers from bladder and bowel incontinence, sexual dysfunction, and reflex sympathetic dystrophy; qualitatively different injuries. |
| *Javier v. Chin Camo Realty*, No. 35079/91 (Sup.Ct. New York County 1994) | yes | yes | yes | $ 140,000 | Seamstress suffered RSIs and other upper extremity injury when part of ceiling fell on her. |
| *John v. New York City Health and Hospital Corporation*, 1995 WL 796927 (LRP Jury) (Sup.Ct. New York County 1995) | no | no | no | $2,500,000 | Malpractice after plaintiff was admitted to hospital for severe head injuries resulting from mugging; sustained injuries included immediate amputation of one leg and amputation of the other leg after eight operations; qualitatively different injuries. |
| *Johnson v. Danly Machine Specialties*, 183 A.D.2d 592, 584 N.Y.S.2d 26 (1st Dept.1992) | no | no | no | $1,500,000 | 19 year-old's dominant hand caught in power press; crushing injury resulted in partial amputation of three fingers; qualitatively different injuries. |
| *Kelly v. DiPaolo*, No. 19043/90 (Sup. Ct. Westchester County 1995) | yes | no | no | $1,200,000 | 8 year-old injured when thrown from a horse; injuries included angulated displaced fractures of the left (nondominant) radius and ulna requiring closed reduction; fasciotomy of the left forearm with carpal tunnel release; split thickness skin grafting with permanent scarring on the forearm and right hip (donor site); decreased trip and arm strength. |
| *Kirschhoffer v. Van Dyke*, 173 A.D.2d 7, 577 N.Y.S.2d 512 (3d Dept.1991) | yes | no | no | $1,825,000 | 38 year-old woman with back injury requiring laminectomy, spinal fusion, permanent insertion of Harrington rods; body brace; bedridden for four months; may require further surgery; 75–80% disability. |

| CASE NAME | COMPARE TO GERESSY? | COMPARE TO JACKSON? | COMPARE TO ROTOLO? | PAIN & SUFFERING AWARD | ADDITIONAL INFORMATION |
|---|---|---|---|---|---|
| *Krieger v. Bancalari*, No. 12652/87 (Nassau County)—settled 1992 | no | no | no | N/A | General settlement figure only. |
| *Lee v. J & B Farm Inc.*, No. 15604/93 (Sup. Ct. Kings County 1996)—settled 1996 | no | no | no | N/A | General settlement figure only. |
| *Legotti v. Long Island Railroad*, 93–CV–1259 (E.D.N.Y. 1996) | no | yes | yes | $ 85,000 | Plaintiff, a 41 year-old ticket clerk, was diagnosed with lateral epicondylitis, an RSI, in his right dominant arm, from using a ticket validating machine at work. Underwent elbow surgery. |
| *Lentz v. Long Island Railroad*, 86–CV–0868 (E.D.N.Y. 1989) | no | no | no | N/A | General damage award only. |
| *Lim v. Atlas–Gem Erectors Co. Inc.*, No. 7213/92 (Sup. Ct. Bronx County 1995) | yes | no | no | $1,250,000 | Laborer injured at construction site; injuries included herniated disc at C4–5; injury to C5–6 requiring a disectomy and fusion of C4–6; neurological deficit with antalgic gait; numbness of left (dominant) arm. |
| *Mack v. Bermudez*, No. 9942/81 (Sup. Ct. Queens County 1982) | no | no | no | N/A | General settlement figure only. |
| *Micalizzi v. Stanford Superior Drug, Inc.*, No. 16145/91 (Sup.Ct. Bronx County 1993) | no | yes | yes | $ 35,000 | Bilateral carpal tunnel from car accident. |
| *Miller v. Fay's Drug Co. Inc.*, No. 6326/84 (Sup.Ct. Albany County 1986) | no | no | no | N/A | General damage award only. |
| *O'Brien v. City of New York*, 231 A.D.2d 698, 647 N.Y.S.2d 561 (2d Dept. 1996) | no | no | no | $1,700,000 | Pedestrian in car accident suffered injuries including severe brain damage with right-side paralysis, a crushed femur and acetabulum, partial blindness in the right eye; was in a comma for several months; confined to a wheelchair and requires full-time custodial care for the rest of his life; qualitatively different injuries. |

| CASE NAME | COMPARE TO GERESSY? | COMPARE TO JACKSON? | COMPARE TO ROTOLO? | PAIN & SUFFERING AWARD | ADDITIONAL INFORMATION |
|---|---|---|---|---|---|
| *Ogborn v. Alphin Haus,* No. 647/91 (Sup.Ct. Delaware County 1992) | no | no | no | N/A | General damage award only. |
| *Ortado v. Gluck,* No. 11886/88 (Sup. Ct. Queens County 1996) | yes | no | no | $1,050,000 | Severe lower extremity injuries, herniated lumbar disc, reflex sympathetic dystrophy in lower right leg; work related injury resulting in severe change in life. |
| *Papa v. City of New York,* 194 A.D.2d 527, 598 N.Y.S.2d 558 (2d Dept.1993) | no | no | no | N/A | Action involving assault and battery, negligence, false arrest, malicious prosecution, and civil rights violation stemming from police officer attack on plaintiffs. One plaintiff suffered a concussion with organic brain dysfunction, which completely disabled him from his occupation as an attorney and also suffered dislocated shoulder, three fractured ribs, and a torn meniscus. Second plaintiff suffered bruises, cuts and contusions, and received only emergency room treatment for his physical injuries; also suffered psychological trauma. Qualitatively different tortious event and subsequent injuries. |
| *Parises v. Greek Orthodox Archdiocese,* No. 240034/87 (Sup. Ct. New York County 1992) | no | no | no | N/A | General verdict with no breakdown. |
| *Parperi v. Dweck,* No. 29912/93 (Kings County)—settled 1996 | no | no | no | $100,000 | General settlement figure only. |
| *Perilla v. Miller,* No. 1578/94 (Sup.Ct. Sullivan County 1996) | no | yes | yes | $30,000 | Work injury resulted in crush fracture of the distal portion of the right (dominant) thumb with muscle and tendon injuries, clinically diagnosed reflex sympathetic dystrophy; surgery recommended but plaintiff refused. |
| *Perry v. Crawford,* No. 850/91 (Delaware County)—settled 1993 | no | no | no | N/A | General settlement figure only. |

| CASE NAME | COMPARE TO GERESSY? | COMPARE TO JACKSON? | COMPARE TO ROTOLO? | PAIN & SUFFERING AWARD | ADDITIONAL INFORMATION |
|---|---|---|---|---|---|
| Pescatore v. Pan American World Airways, 97 F.3d 1 (2d Cir.1996) | no | no | no | N/A | Injuries sustained in air plane crashes and terrorist attacks do not provide good comparisons to the injuries in the instant case. |
| Picarelli v. Prime Automotive Parts, 1251/93—Settled 1995 | no | no | no | N/A | General settlement figure only. |
| Polipo v. Sanders, 227 A.D.2d 256, 642 N.Y.S.2d 302 (1st Dept.1996) | no | no | no | 0 | Tenant hurt through negligence of plumber. On appeal, finding of liability reversed (and therefore damage award not reviewed). |
| Ramirez v. New York City Housing Authority, No. 20326/92 (Sup. Ct. Bronx County 1995) | yes | yes | yes | $238,000 | Fractured fifth finger of the right (dominant) hand resulting in a mallet finger deformity; severe trauma to the palm resulting in nodule that caused "trigger finger" in the fourth finger; reflex sympathetic dystrophy. |
| Redavid v. Long Island Railroad, 83–CV–1373 (E.D.N.Y.1986) | no | no | no | N/A | General damage award only. |
| Regina v. Flanagan, No. 1164/91 (Sup. Ct. Richmond County 1995) | no | no | no | $165,000 | Jaw injury, RSD in the neck, and possible spinal injury; injuries are not sufficiently similar and there is insufficient information available on pain, suffering, and the resulting changes in plaintiff's quality of life, if any. |
| Rondinone v. Matta, 99 A.D.2d 733, 472 N.Y.S.2d 861 (1st Dept.1984) | no | no | no | N/A | General damage award and old case. |
| Roshwalb v. Regency Maritime Corp., 182 A.D.2d 401, 582 N.Y.S.2d 140 (1st Dept.1992) | yes | no | yes | $ 750,000 | 63 year-old woman fell; subcondylar fracture of dominant elbow requiring open reduction and reconstruction with transposition of ulnar nerve, insertion of "Y" plate and 14 screws and wires; later had operation to remove hardware, and may require additional surgeries; constant pain, numbness, scarring and limitation of use. |
| Ross v. NYU Medical Center, No. 2568/92 (Sup.Ct. New York County 1994) | no | no | no | N/A | General settlement figure only. |

| CASE NAME | COMPARE TO GERESSY? | COMPARE TO JACKSON? | COMPARE TO ROTOLO? | PAIN & SUFFERING AWARD | ADDITIONAL INFORMATION |
|---|---|---|---|---|---|
| *Rung v. St. Luke's Hospital Center*, 1825/89 (Sup. Ct. Oneida County 1994) | no | no | no | $1,000,000 | Medical malpractice in which healthy person received a tetnas shot by an unwrapped, unsterile needle with which a young child had been playing; plaintiff experienced chronic infections and permanent loss of use of the left arm. |
| *Ryan v. Long Island Railroad*, 92–CV–3029 (E.D.N.Y. 1994) | no | yes | yes | $ 55,000 | Ticket clerk suffered bilateral carpal tunnel system from use of machine at work. |
| *Scala v. Moore McCormack Lines*, 985 F.2d 680 (2d Cir. 1993) | yes | no | yes | $ 750,000 | From accident at work, plaintiff suffered disabling knee injury requiring several surgical procedures and resulting in development of phlebitis, causing plaintiff to spend 6 months in a wheelchair and totally disabling him from job as a longshoreman. |
| *Shu–Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45 (2d Cir.1984) | no | no | no | N/A | Injuries sustained in air plane crashes do not provide good comparisons to the injuries in the instant case. |
| *Sinclair v. State of New York*, No. 68449 (Ct. of Claims Buffalo 1988) | no | no | no | N/A | General damage award only. |
| *Singh–Walia v. Citywide Ambulance Corp.*, 1996 WL 643326 (LRP Jury) (Bronx County)—settled | no | no | no | N/A | General settlement figure only. |
| *Sladick v. Hudson General Corporation*, 226 A.D.2d 263, 641 N.Y.S.2d 270 (1st Dept. 1996) | no | no | no | $7,500,000 | Man in mid–30s hit by mobile lounge at airport; crush injury required above the knee leg amputation; left with stump pain; back pain, phantom pain and depression; numerous operations; qualitatively different tortious event and subsequent injuries. |
| *Snyder v. Conrail*, 83–CV–938 (N.D.N.Y. 1985) | no | no | no | N/A | General damage award only. |
| *Spoto v. S.D.R. Construction*, 5701/89 (Kings County 1994) | no | no | no | 0 | Original verdict was $1,400,000, but the verdict was not reviewed on appeal since the case was reversed on other grounds. |
| *Stiles v. Batavia Atomic Horseshoes, Inc.*, 81 N.Y.2d 950, 597 N.Y.S.2d 666, 613 N.E.2d 572 (1993) | no | no | no | N/A | General damage award only. |

| CASE NAME | COMPARE TO GERESSY? | COMPARE TO JACKSON? | COMPARE TO ROTOLO? | PAIN & SUFFERING AWARD | ADDITIONAL INFORMATION |
|---|---|---|---|---|---|
| *Summerville v. City of New York*, 39604/91 (Sup.Ct. Kings County 1996) | no | no | no | $5,057,316 | 30 year-old innocent by-stander shot twice by off-duty police officer; mistakenly arrested and charged with bank robbery (charges later dropped). Gunshot wounds to the left (nondominant) arm, stomach, and colon. Left arm hand-cuffed to hospital bed for 12 hours. Plaintiff developed reflex sympathetic dystrophy (rsd) in left arm which is now paralyzed. He underwent an unsuccessful nerve graft in 1992 in an attempt to restore some function to the arm. A dorsal column stimulator was implanted into his spinal cord in 1995 to relieve the constant burning sensation in his arm, but this procedure was also unsuccessful. Plaintiff had not returned to work by time of trial and it was unclear whether or not he would. |
| *Thurman v. State of New York*, No. 79207 (Ct. of Claims, Binghamton 1991) | yes | yes | yes | $ 60,000 | 73 year-old woman slipped and fell in the pool area of a gym; resultant injuries included fracture of the left (dominant) distal radius, requiring closed reduction; rsd with a loss of motion in hands and fingers. Daily activities of self-care have become quite difficult. |
| *Turchin v. Bar & Bar* 92–CV–1448 (S.D.N.Y. 1994 | yes | no | no | $ 290,000 | Construction site injury resulted in herniated discs at C4–5, C5–6, and C6–7 requiring discectomy of the three discs, bone grafting and fusion as well as psychological trauma. |
| *Ubiles v. Rosenzweig Lumber Corp.*, 225 A.D.2d 468, 639 N.Y.S.2d 383 (1st Dept.1996) | yes | no | yes | $1,150,000 | 28 year-old truck driver; five fractures of dominant elbow, two open reduction and internal fixation procedures; 80% loss of range of motion; incidents of severe pain; can no longer perform manual labor. |
| *Urrea v. Long Beach Plaza Corp.* No. 14339/88 (Nassau County 1990)—settled $450,000 | no | no | no | N/A | General settlement figure only. |
| *Vassar–Roller v. Steiner, D.P.M.*, No. 17270/91 (Bronx County)—settled 1994 | no | no | no | $375,424.43 | Settlement based on jury verdict, presumably settlement was proportionate to the jury award; case inapposite as it involves malpractice for complications arriving from foot surgery. |

| CASE NAME | COMPARE TO GERESSY? | COMPARE TO JACKSON? | COMPARE TO ROTOLO? | PAIN & SUFFERING AWARD | ADDITIONAL INFORMATION |
|---|---|---|---|---|---|
| *Vellela v. Craftsman Woodworkers, Ltd.,* No. 27501/91 (Suffolk County)—settled 1996 | no | no | no | N/A | General settlement figure only. |
| *Villalta v. City of New York,* No.2051/93 (Sup.Ct. Bronx County 1994) | no | no | no | N/A | General damage award only. |
| *Wendell v. Supermarkets General Corp.,* 189 A.D.2d 1063, 592 N.Y.S.2d 895 (3d Dept.1993) | yes | no | no | $ 115,000 | Plaintiff slipped and fell resulting in herniated discs at C5–6 and C6–7 that impinged on her spinal cord and compressed a nerve leading to her arm; cannot return to work. |
| *Weyant v. City of New York,* 162 Misc.2d 132, 616 N.Y.S.2d 428 (Sup.Ct. Kings County 1994) | yes | no | no | $2,000,000 | Car accident at work resulted in herniated discs at C5–6 and C6–7 requiring a disectomy and a spinal fusion at C5–6; tear of medial meniscus; plaintiff underwent three separate surgeries on the knee, including reconstructive surgery, removal of bony matter, and the bracing of an unstable patella; he also underwent the insertion of a bone graft at C5–6; plaintiff is on 3/4 disability. |
| *Williams v. Seaman's Furniture Co.* No. 44844/92 (Sup. Ct. Kings County 1996) | yes | no | yes | $1,575,909.27 | Itemized verdict reduced, presumably proportionately; 47 year-old secretary slipped and fell in her home over drop cloth carelessly placed on floor by delivery persons. Severed nerves in left (non-dominant) hand; rsd which spread to arm; lost use of hand; underwent extensive and unsuccessful physical therapy; could no longer work as secretary. |
| *Young v. 153–157 Lennox Ave. Co.,* No. 13813/90 (Bronx County 1993)—settled 1993 | yes | yes | yes | $ 410,000 | Settlement after itemized jury verdict where verdict was entirely for pain and suffering. Due to accident with elevator, plaintiff suffered bilateral carpal tunnel syndrome with numbness, tingling, and weakness; plaintiff underwent two surgical releases; suffered permanent nerve damage; could not resume typing at work for 4 years, and then only for short periods of time; cannot engage in hobbies like swimming and volleyball. |

Patricia Geressy: Tentative Computations

| | Jury Verdict | |
|---|---|---|
| (a) | Past conscious pain and suffering, emotional distress, and the diminution of the quality of life | $ 490,000 |
| (b) | Past disability | $ 250,000 |
| (c) | Past economic loss due to lost wages and fringe benefits | $ 40,000 |
| (d) | Past economic loss due to lost household services | $ 15,000 |
| (e) | Future conscious pain and suffering, emotional distress and diminution of the quality of life | $3,000,000 |
| (f) | Future disability | $1,100,000 |
| (g) | Future economic loss due to lost earnings | $ 200,000 |
| (h) | Future economic loss due to lost household services | $ 50,000 |
| (i) | Future medical expenses | $ 200,000 |
| | Total Jury Verdict | $5,345,000.00 |
| | Jury Verdict Without Pain and Suffering Award | $1,855,000.00 |
| | Jury Verdict Pain and Suffering Portion Only | $3,490,000.00 |
| | Mean | $747,372.00 |
| | Standard Deviation | $606,873.40 |
| | Range Within One Standard Deviation | $140,499 to 1,354,246 |
| | Range Within Two Standard Deviations | 0 to $1,961,119 |
| | Median | $750,000 |

## Appendix C

Jill M. Jackson: Tentative Computations

| | Jury Verdict | |
|---|---|---|
| (a) | Past conscious pain and suffering, emotional distress, and the diminution of the quality of life | $ 25,000 |
| (b) | Past disability | $ 25,000 |
| (c) | Past economic loss due to lost wages and fringe benefits | $115,000 |
| (d) | Past economic loss due to lost household services | $ 2,000 |
| (e) | Future conscious pain and suffering, emotional distress and diminution of the quality of life | $ 18,000 |
| (f) | Future disability | $ 18,000 |
| (g) | Future economic loss due to lost earnings | $ 90,000 |
| (h) | Future economic loss due to lost household services | $ 2,000 |
| (i) | Future medical expenses | $ 7,000 |
| | Total Jury Verdict | $302,000.00 |
| | Jury Verdict Without Pain and Suffering Award | $259,000.00 |
| | Jury Verdict Pain and Suffering Portion Only | $ 43,000.00 |
| | Mean | $147,925 |
| | Standard Deviation | $119,371.40 |
| | Range Within Standard Deviation | $28,554 to $267,297 |
| | Range Within Two Standard Deviations | $0 to $386,668 |
| | Median | $132,000 |

Jeanette Rotolo: Tentative Computations

| Jury Verdict | | |
|---|---|---|
| (a) | Past conscious pain and suffering, emotional distress, and the diminution of the quality of life | $40,000 |
| (b) | Past disability | $35,000 |
| (c) | Past economic loss due to lost wages and fringe benefits | $30,000 |
| (d) | Past economic loss due to lost household services | $ 2,000 |
| (e) | Future conscious pain and suffering, emotional distress and diminution of the quality of life | $60,000 |
| (f) | Future disability | $53,000 |
| (g) | Future economic loss due to lost earnings | $30,000 |
| (h) | Future economic loss due to lost household services | $ 3,000 |
| (i) | Future medical expenses | $21,000 |

| | |
|---|---|
| Total Jury Verdict | $274,000.00 |
| Jury Verdict Without Pain and Suffering Award | $174,000.00 |
| Jury Verdict Pain and Suffering Portion Only | $100,000.00 |
| Mean | $404,214 |
| Standard Deviation | $465,489 |
| Range Within One Standard Deviation | 0 to $869,703 |
| Range Within Two Standard Deviations | 0 to $1,335,192 |
| Median | $149,653 |