9 F.Supp.2d 307 (1998)
In re JOINT EASTERN AND SOUTHERN DISTRICT ASBESTOS LITIGATION.
John CONSORTI and Frances Consorti, Plaintiffs,
v.
ARMSTRONG WORLD INDUSTRIES, INC., et al., Defendants.
No. 92 Civ. 6377(RWS).
United States District Court, S.D. New York.
June 15, 1998.
*308 Levy Phillips & Konigsberg (Moshe Maimon, of counsel), New York City, for plaintiffs.
Ddebevoise & Plimpton (Mark P. Goodman, Karis S. Schwartz, of counsel), New York City (Tucker & Associates, of counsel), Randolph, MA, for defendant Owens Corning.

OPINION
SWEET, District Judge.
After twenty-five days of trial, the jury awarded plaintiff John Consorti ("Consorti") $12 million for pain and suffering. Defendant Owens Corning Fiberglas Corporation ("OCF") now moves for a new trial or a remittitur reducing Consorti's pain and suffering to an amount no greater than $3.5 million. Although the motion for a new trial or, in the alternative, a remittitur had been previously denied, revisitation of the issue in light of the United States Supreme Court's decision in Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996), is required. The Second Circuit has remanded the case to this Court for reconsideration of the motion for remittitur in conformity with the opinion of the Supreme Court.
For the reasons set forth below, OCF's motion for a new trial is granted. However, its motion for remittitur of at least $8.5 million is denied. The remitted amount of Consorti's pain and suffering award, if Consorti acquiesces, will be set at $5 million.

Prior Proceedings and Facts
The procedural path that this case followed from its filing through trial and the first set of post-trial motions, as well as a detailed account of the facts, are fully recounted in prior opinions, familiarity with which is assumed. See In re New York Asbestos Litig., 847 F.Supp. 1086 (S.D.N.Y.1994); In re New York Asbestos Litig., 149 F.R.D. 490 (S.D.N.Y.1993); In re New York Asbestos Litig., 145 F.R.D. 644 (S.D.N.Y.1993). The prior proceedings and facts relevant to the instant motion are set forth below.
Consorti owned 40% of Veteran Pipe Covering ("Veteran"), a family insulator business. He worked for Veteran as a pipe covering insulator from 1960 to 1963, and from 1970 to 1978. From 1963 to 1970, he worked as an insulator for another family business, State Pipe Covering. In 1978, he became Vice President of Veteran, a position at which he remained until 1992. While working at these businesses, and at least through the mid-1970s, Consorti was exposed to asbestos products, including OCF's product.
Consorti began to suffer back problems in August 1991. In February 1992, he was diagnosed with pleural mesothelioma, an incurable cancer of the lining of the lung. He died after trial, at the age of 51, in November 1993.
Consorti initiated this asbestos personal injury action against numerous defendants in this district in 1992. His suit was one of the many thousands of asbestos cases reassigned by the Multidistrict Litigation Panel to the Eastern District of Pennsylvania for discovery and pretrial proceedings. Because of his rapidly advancing illness, Consorti's case was remanded to this district for expedited trial.
The trial of Consorti's action, which had been consolidated with three other cases of mesothelioma due to asbestos exposure, began on June 21, 1993. At trial, Consorti proved that his incurable fatal disease was caused by his ingestion and respiration of asbestos fibers. He demonstrated that he had endured enormous suffering from the mesothelioma and was likely to die within a few more months.
*309 On July 23, 1993, the jury in this action returned a verdict in favor of Consorti and his wife, Frances, against OCF. In doing so, the jury awarded nonpecuniary damages of $18 million, $12 million of which was awarded to Consorti for 32 months of pain and suffering. The jury awarded $8 million for approximately 23 months of pain and suffering prior to trial, and $4 million for what it estimated would be the suffering Consorti would endure during the final nine months of his life. The instant issue concerns the $12 million pain and suffering award.
On January 21, 1994, this Court denied a motion for new trial or remittitur, finding that the award did not "shock the conscience" of the court, which "must not remain fixed in time but must rather retain the capacity for change based on the experience of others and the determinations made in particular cases." In re New York Asbestos Litig., 847 F.Supp. 1086, 1096 (S.D.N.Y.1994) [hereinafter Consorti I] The holding was based largely on a comparison to awards permitted by other federal courts in asbestos cases filed in New York. See id. at 1095-98, 1141-43. In particular, the decision relied on the denial of remittitur of a $4.5 million award for pain and suffering in a mesothelioma case of 11 months duration. See id. at 1096-97, 1142-44 (citing In re Joint E. & S. Dists. Asbestos Litig., 798 F.Supp. 925, 937-38 (E.D.N.Y.1992), rev'd on other grounds, 995 F.2d 346 (2d Cir.1993) [hereinafter McPadden]). Consorti I found that the award to Consorti did not shock the conscience based on its observation that the plaintiff in McPadden received a pain and suffering award of approximately $409,000 per month, see Consorti I, 847 F.Supp. at 1097, as compared to Consorti's award of $375,000 per month.
The Second Circuit reversed, ruling that this Court had erred by (i) applying the "shock the conscience" standard rather than the less deferential "deviates materially from reasonable compensation" standard applied in the New York courts, see Consorti v. Armstrong World Indus., Inc., 72 F.3d 1003, 1009-15 (2d Cir.1995) [hereinafter Consorti II] (citing CPLR § 5501(c)), and (ii) relying largely on federal rather than state decisions in assessing the reasonableness of the award. See id. at 1012-13. The Second Circuit held that the appropriate comparison was to awards in mesothelioma cases of similar duration to Consorti's which were considered by Justice Freedman in cases litigated in New York Supreme Court. See id. at 1014. Finding that pain and suffering awards in New York state courts in comparable cases ranged from approximately $1 million to a maximum of $3 million, the Second Circuit concluded that "an award exceeding $3.5 million would deviate materially from what is deemed reasonable under New York law." Id. at 1015.[1]
On July 1, 1996, the United States Supreme Court granted certiorari, vacated the Second Circuit's decision in Consorti II, and remanded the case to the Second Circuit for further consideration in light of Gasperini v. Center of Humanities, Inc., 518 U.S. 415, 116 S.Ct. 2211, 135 L.Ed.2d 659 (1996). See Consorti v. Owens-Corning Fiberglas Corp., 518 U.S. 1031, 116 S.Ct. 2576, 135 L.Ed.2d 1091 [hereinafter Consorti III].
In Gasperini, the Supreme Court affirmed the Second Circuit's holding that, in a diversity action, state law governs the issue of remittitur, but reversed, finding it error for the Second Circuit itself to have applied the New York state court standard, CPLR § 5501(c) (as the Second Circuit also did in the instant case), instead of reviewing the district court's application of § 5501(c) for abuse of discretion. See Gasperini, 116 S.Ct. at 2225.[2]
Following the Supreme Court's direction in Gasperini, the Second Circuit, on December 16, 1996, remanded the instant matter so that *310 this Court could "reconsider the motion for remittitur, `check the jury's verdict against the relevant New York decisions' and `test [it] against CPLR § 5501(c)'s "deviates materially" standard.'" Consorti v. Armstrong World Indus. Inc., 103 F.3d 2, 4-5 (2d Cir. 1995) [hereinafter Consorti IV]. The remand order clarifies that in assessing the size of Consorti's pain and suffering award, this Court must look to the "governing decisions of the New York state courts" rather than the "federal court precedents" that guided the earlier analysis. Id. at 4.
OCF filed the instant motion requesting a new trial or, in the alternative, a remittitur reducing Consorti's $12 million pain and suffering award to no greater than $3.5 million on February 2, 1998. Oral arguments were heard on April 1, 1998, at which time the motion was deemed fully submitted.

Discussion

I. Legal Standard Applicable in Deciding OCF's Motion for New Trial or Remittitur

In deciding a motion challenging the size of a verdict and requesting a new trial on damages, the Supreme Court has determined that a federal district court sitting in diversity should apply state law standards. See Gasperini, 116 S.Ct. at 2224 n. 22. In New York, this standard is set by New York's CPLR § 5501(c), which provides that appellate courts are to review jury damage awards under a "deviates materially" standard. This is also the standard to be applied by New York trial courts. See Gasperini, 116 S.Ct. at 2218 (citing, inter alia, Inya v. Ide Hyundai, Inc., 209 A.D.2d 1015, 619 N.Y.S.2d 440 (4th Dep't1994); Lightfoot v. Union Carbide Corp., 901 F.Supp. 166, 169 (S.D.N.Y.1995)). Because Gasperini directs federal district courts applying New York law to employ the "deviates materially" standard rather than the federal courts' more rigorous "shock the conscience" standard to questions of the adequacy of a verdict, that standard will be utilized in reviewing Consorti's $12 million pain and suffering award.
The standard "`for determining excessiveness and appropriateness of remittitur is somewhat ambiguous.'" Gasperini, 116 S.Ct. at 2217 (quoting Consorti II, 72 F.3d at 1012-13). Historically, New York courts, like those in the federal system and the majority of jurisdictions in the United States, applied the "shock the conscience" standard to determine the possible excessiveness or insufficiency of jury awards. However, "in 1986, in an effort to curb escalating awards, the New York legislature created a statutory standard designed to give courts greater discretion in monitoring verdicts." Geressy v. Digital Equip. Corp., 980 F.Supp. 640, 653 (E.D.N.Y.1997) (citing Legislative Findings and Declarations, 1986 N.Y.Laws 470 (McKinney)). The statute provided for judicial review of jury awards. In relevant part, it reads:
In reviewing a money judgment ... in which it is contended that the award is excessive or inadequate and that a new trial should have been granted unless a stipulation is entered to a different award, the appellate division shall determine that an award is excessive or inadequate if it deviates materially from what would be reasonable compensation.

CPLR § 5501(c) (emphasis added). As asserted by the court in Geressy, "[t]hese last eight words, and in particular, the two phrases deviates materially and reasonable compensation provide a more complex challenge to a federal trial court than first meets the eye." Geressy, 980 F.Supp. at 653.
"This legislation was apparently intended to relax the former standard of review and to facilitate appellate changes in verdicts." O'Connor v. Graziosi, 131 A.D.2d 553, 554, 516 N.Y.S.2d 276, 277 (2d Dep't1987) (citations omitted). This new language has been understood by both courts and commentators as providing courts with greater latitude than the former "shocks the conscience" standard for reviewing and altering jury awards. See Gasperini, 116 S.Ct. at 2218-19 (stating that the "deviates materially" standard calls for closer surveillance than "shock the conscience" oversight and "in design and operation, [it] influences outcomes by tightening the range of tolerable awards"). Professor David D. Siegel, a leading New York civil procedure scholar, has written that "[t]he amendment invites the appellate division's *311 alteration of the [jury] verdict on the presumably lighter finding that the award `deviates materially from what would be reasonable compensation.'" David D. Siegel, New York Practice 617 (2d ed.1991).
As mandated by Gasperini, to determine whether a particular award "deviates materially from what would be reasonable compensation," New York state courts look, as must be done here, to awards approved in similar cases. See Gasperini, 116 S.Ct. at 2218. Prior awards, however, are regarded by the New York appellate courts performing § 5501(c) review as not binding but instructive. See, e.g., Shea v. Icelandair, 925 F.Supp. 1014, 1021 (S.D.N.Y.1996) (noting that "[l]ower state court decisions, while not binding, carry substantial weight"); Senko v. Fonda, 53 A.D.2d 638, 639, 384 N.Y.S.2d 849, 851 (2d Dep't1976) (stating that prior awards "may guide and enlighten the court[s]" "in the exercise of their discretion"). Additionally, mindful that "the amount of damages to be awarded is primarily a question of fact ... and [that] considerable deference should be accorded to the interpretation of the evidence by the jury, [the] discretionary power [a court possesses to alter a jury's damage award] is to be exercised sparingly." Duncan v. Hillebrandt, 239 A.D.2d 811, 657 N.Y.S.2d 538, 540 (3d Dep't1997) (citations omitted); see Gasperini v. Center for Humanities, Inc., 972 F.Supp. 765, 768 (S.D.N.Y.1997).
The endeavor of demarcating an award in the instant case so that it does not deviate materially from reasonable compensation is complicated by the fact that each experience of suffering is unique. "The reverberations from a tragic event are not necessarily any more intelligible or quantifiable through an examination of other peoples' suffering." Geressy, 980 F.Supp. at 655. Still, the first step for any court attempting to develop a sense of what is reasonable compensation under the circumstances is the consideration of comparable injuries.
CPLR 5501(c) forces the court into the awkward position of attempting to do what the tort victim cannot  analyze, classify and (implicitly) rank the affliction of one tort victim against that of another. In one sense this is an impossible endeavor. To measure the impact of a tragedy in the life of one person vis-a-vis another is beyond judicial (and perhaps human) capacity. Yet, if the courts are to administer a fair and just tort system, they must work out methods, however imperfect, for evaluating and entering tort judgments under Gasperini.

Id.
In facing the issue of remittitur in a case where the plaintiffs died from mesothelioma caused by occupational exposure to asbestos, Justice Lehner noted that:
the determination of what amount would so deviate is one of the most difficult decisions required to be made by a court. In appellate decisions there generally is no explanation of the reasons for a finding of a deviation. In making such determinations a court's obligation is to examine comparable injuries. However, similar injuries to two different plaintiffs may result in significantly different levels of pain and suffering, which makes the task of comparing the injuries in one case to those in another most formidable.
In re New York City Asbestos Litig., N.Y.L.J., June 4, 1997, at 26, 173 Misc.2d 121, 660 N.Y.S.2d 803 (N.Y.Sup.1997) [hereinafter Dollas].[3]
Theoretically, reasonable compensation is compensation that would make a plaintiff whole, as if he or she never suffered the injury. Some damage awards are quantifiable, such as lost earnings and past medical bills. Other awards, however, such as pain and suffering do not lend themselves as easily to computation. The New York Court of Appeals acknowledges that:
An economic loss can be compensated in kind by an economic gain; but recovery for noneconomic losses such as pain and suffering and loss of enjoyment of life rests on the legal fiction that money damages *312 can compensate for a victim's injury.... We accept this fiction, knowing that although money will neither ease the pain nor restore the victim's abilities, this device is as close as the law can come in its effort to right the wrong. We have no hope of evaluating what has been lost, but a monetary award may provide a measure of solace for the condition created....
McDougald v. Garber, 73 N.Y.2d 246, 254, 536 N.E.2d 372, 374-75, 538 N.Y.S.2d 937, 939-40 (1989).
The task at hand requires not only the determination of sufficient compensation to assuage nonmonetary suffering, but also the identification of the upper limit beyond which the award cannot go. At the outset, the group of similar cases that will serve as a referent must be identified. Still, "measuring pain and suffering in dollars is inescapably subjective." Gibbs v. United States, 599 F.2d 36, 39 (2d Cir.1979). As indicated, all plaintiffs differ. That there exists an infinite variety of people who will experience different reactions to similar tragedies further compounds the difficulty of quantifying a reasonable verdict. See Geressy, 980 F.Supp. at 656. Moreover, "[t]here is an inherent difficulty in considering such disparate factors as a plaintiff's `ability to dance, bowl, swim, or engage in similar recreational activities, inability to perform customary chores and ... to engage in the usual family activities.'" Id. (quoting Downie v. United States Lines Co., 359 F.2d 344, 347 n. 3 (3d Cir.1966)). Nonetheless, in order to attach a dollar figure to Consorti's pain and suffering that is "reasonable" under the circumstances as determined by New York law, this murky territory must be traversed.

II. The Damages Awarded for Pain and Suffering to Consorti Were Excessive According to New York State Law

Upon comparison of Consorti's $12 million pain and suffering award with those granted under New York law in similar cases, it has become apparent that the $12 million "deviates materially" from what may be considered "reasonable compensation." Therefore, unless Consorti accepts a remitted judgment of $5 million, a new trial on the issue of pain and suffering damages will be granted.

A. State Court Decisions in Comparable Cases

In choosing sufficiently analogous cases against which to measure Consorti's award, similar injuries or diagnoses are primary but not controlling criteria. To assess the pain and suffering resulting from a tragic event, the court also may consider the "causal agent itself and the circumstances surrounding the injury in determining the nature of the anguish for which the plaintiff should be compensated. The life changes that follow the ... event are also of critical importance." Geressy, 980 F.Supp. at 657.
In evaluating whether an award is reasonable, it is almost impossible to find cases where all relevant factors are identical to those in the case at issue. Instead, the court must review "the totality of circumstances of the proffered sample cases to ascertain whether they can provide a basis for comparison. There are almost no `all fours' cases." Id.
Although no New York appellate court has considered the issue of remittitur in an asbestos case, New York trial courts have ample experience in the matter. Justice Helen E. Freedman in particular  "the trial judge to whom all New York asbestos litigation has been assigned by administrative order," Consorti II, 72 F.3d at 1014  is a leading New York jurist handling asbestos cases. Based largely on Justice Freedman's substantial experience, the considerable number of cases of death by mesothelioma reviewed by Justice Freedman provide the most appropriate source from which to discern a pattern of reasonable remittiturs of mesothelioma verdicts under New York state law. However, because the highest state court has not spoken on the issue, and this Court must attempt to forecast how that court might rule, lower state court decisions are not binding but rather instructive in formulating the prediction. See Shea, 925 F.Supp. at 1021-22.
Consorti proposes that the award be measured against those rendered in various nonasbestos *313 cases, such as DES,[4] AIDS, amputation, back injury, and burn cases. Given the availability of remitted verdicts in cases where plaintiffs suffered from mesothelioma due to asbestos exposure, however, broadening the comparison group to nonasbestos cases would cloud the issue and increase the probability of reaching an amount that may not be within the "reasonable" range for mesothelioma victims. Moreover, Consorti has more in common with those plaintiffs who suffered the same disease due to the same causal agent than, for example, a middle-aged man who suffered a leg amputation. Thus, the cases identified below for comparison are limited to asbestos cases.
In 1990 and 1991, Justice Freedman decided, and remitted, pain and suffering awards in Didner v. Keene Corp., N.Y.L.J., Jan. 4, 1991, at 22 (N.Y.Sup.Ct. Dec. 17, 1990), aff'd, 188 A.D.2d 15, 593 N.Y.S.2d 238 (1st Dep't 1993) (no discussion of remittitur), modified, 82 N.Y.2d 342, 624 N.E.2d 979, 604 N.Y.S.2d 884 (1993), and In re New York City Asbestos Litigation, 151 Misc.2d 1, 572 N.Y.S.2d 1006 (N.Y.Sup.1991) [hereinafter N.Y. Navy Yard],[5]aff'd, 82 N.Y.2d 821, 625 N.E.2d 588, 605 N.Y.S.2d 3 (1993). These two cases involved 15 separate mesothelioma verdicts.
In Didner, Justice Freedman reduced to $2.3 million a $3.25 million jury award for the pain and suffering of a man who had developed mesothelioma at age 47 and suffered for 26 to 27 months. See Didner, N.Y.L.J., Jan. 4, 1991, at 22. In the N.Y. Navy Yard cases, Justice Freedman remitted 14 mesothelioma verdicts: she reduced to $3 million those awards for persons who had the disease for 34 to 35 months; reduced to $2.2 to $2.4 million those awards for persons who had the disease for 26 to 29 months; reduced to $1.5 million those awards for persons who had the disease for 18 to 20 months; reduced to $1 million those awards for persons who had the disease for seven to eight months; and reduced to $600,000 to $750,000 those awards for persons who had the disease for three to five months. See N.Y. Navy Yard, 151 Misc.2d 1, 572 N.Y.S.2d 1006, 1008-10. In these 15 individual cases, Justice Freedman applied a remittitur formula of permitting approximately $100,000 per month of pain and suffering.
OCF urges that Didner and N.Y. Navy Yard are the only cases relevant to the instant review because the issue presented is the reasonableness of the jury award at the time of Consorti's trial in 1993. Moreover, OCF contends that only these cases can be utilized because it was these very cases that the Second Circuit in Consorti II found proper for comparison in finding that "an award exceeding $3.5 million [in the case at bar] would deviate materially from what is deemed reasonable under New York law." Consorti II, 72 F.3d at 1015.
Furthermore, according to OCF, Didner and N.Y. Navy Yard are the most pertinent decisions against which to assess the reasonableness of Consorti's pain and suffering award for the following additional reasons: first, they involved recovery for pain and suffering resulting from mesothelioma allegedly stemming from asbestos exposure, as does Consorti's claim; second, they establish what was reasonable compensation at the time Consorti's verdict was rendered, since they were decided more or less contemporaneously with the Consorti case; third, they involved severe pain and suffering comparable to Consorti's; and fourth, they are New York decisions, and therefore, "`the best guide for a federal court'" in determining "`at what point awards become excessive.'" In re Asbestos Litig., 986 F.Supp. 761, 770 (S.D.N.Y.1997) (quoting Consorti II, 72 F.3d at 1013).
*314 While OCF's first, third, and fourth reasons are persuasive, the second is not. Consorti's trial took place in 1993, Didner and N.Y. Navy Yard were decided in 1990 and 1991, respectively, and the determination as to an appropriate award is being made today, in 1998. OCF objects to the post-verdict cases discussed below where awards were set in 1995 or subsequent years. According to OCF, because the judgment ultimately entered will include post-verdict interest, comparing the Consorti award to later awards already adjusted upward for time would result in an award of double interest. This statement has merit, however, as Consorti points out, a court's understanding of what is reasonable compensation must not remain fixed in time, but rather must retain the capacity for change based on its own experience, the experience of others, and the determinations made in particular cases. See Consorti I, 847 F.Supp. at 1096.
Given the insight into the reasonableness of awards that is gained from studying post-1991 cases, focusing solely on Didner and N.Y. Navy Yard may shortchange Consorti of an award that a 1993 New York state court would have found to be reasonable. As illustrated below, New York courts have increased their tolerance of pain and suffering damages awarded to mesothelioma victims. What may have been considered reasonable in 1993 may not have been deemed reasonable in 1990 or 1991. Thus, a sensible approach entails extrapolating from pre-1993 as well as post-1993 cases guidance as to what amount New York state courts may have tolerated as reasonable compensation for pain and suffering, given the specific circumstances of this case, in 1993.
Additionally, to reiterate a notion previously stated, awards from New York state trial courts should not be used "`for stare decisis purposes, since each requires sui genesis determination.'" Gasperini, 972 F.Supp. at 768 (quoting Levine v. East Ramapo Cent. Sch. Dist., 192 A.D.2d 1025, 597 N.Y.S.2d 239 (3d Dep't 1993)). Also, deference must be "accorded to the jury's interpretation and review should be done sparingly." Id.
If the asbestos litigation in New York had ceased with the preceding decisions, OCF's proposal of confining the inquiry to Didner and N.Y. Navy Yard would have merit. That, however, has not been the case. In fact, Justice Freedman  with further experience has since gone beyond her Didner "formula," and other New York Supreme Court justices have also addressed the issue in the interim. The continued asbestos litigation and the rendition of jury verdicts in the millions of dollars establish that the jury verdicts in Didner and N.Y. Navy Yard were not entirely unreasonable or aberrational.
In 1995, Justice Freedman again wrote on the subject of remittitur of pain and suffering awards resulting from diagnoses of mesothelioma. In the case of Manning v. Georgia Pacific Corp., No. 102757/94 (N.Y.Sup.Ct. February 3, 1995), Justice Freedman recognized that Didner "may no longer be controlling" and proclaimed that "reasonableness should prevail." Manning, No. 102757/94, slip op. at 9. There, she remitted a pain and suffering verdict of $5 million to $4 million.[6]Id. at 7-10.
In doing so, Justice Freedman noted that Mr. Manning's "pain and suffering, while severe, is not unremitting. Moreover, he is sixty-one, not forty-six, and his health prior to the onset of mesothelioma was at best fair." Id. at 9-10. Mr. Manning "had been disabled as a result of work-related back injuries and arthritis since the late 1970's." Id. at 7-8. Consorti observes that while comparing such cases is difficult, Consorti's pain and suffering cannot be said to have been any less horrendous than Mr. Manning's. In fact, Consorti continues, given the extenuating factors delineated by Justice Freedman, it is reasonable to conclude that a greater value may be placed on Consorti's damages. Unlike Mr. Manning, Consorti was in his late forties when he was diagnosed with mesothelioma, he died at the age of 51, and his health prior to the disease was quite good.
In Manning, Justice Freedman also noted that other justices in the New York Supreme *315 Court, undeterred by Didner and N.Y. Navy Yard, "have sustained substantial awards too. Justice Moskowitz reduced an award [against OCF] for 22 months of pain and suffering [from $5 million] to 3.5 million dollars and Justice Lehner allowed a one million dollar award for eight weeks of pain and suffering to stand." Id. at 9.
OCF has asserted that Manning should not change the Second Circuit's assessment of $3.5 million as the maximum level of damages in the instant case on the grounds that the Second Circuit has held in Consorti II that it does not. However, Justice Lehner described the Second Circuit's neglect of Manning as follows:
In an interesting circuitous footnote, the [Second Circuit] referred to the decision of Justice Freedman in Manning ..., noting that therein [Justice Freedman had] raised the level of damages she found acceptable, but concluded that such "raising" did not alter its view as to New York law in that Justice Freedman "deferred to the very district court judgments ... which we [the Second Circuit] ... criticize for insufficient deference to her earlier rulings."
Dollas, N.Y.L.J., June 4, 1997, at 26 (quoting Consorti II, 72 F.3d at 1015 n. 16). Moreover, in addition to mentioning in Manning those district court judgments that the Second Circuit "criticize[d]," Justice Freedman also took heed of the decisions of her "colleagues" in state court, namely Justices Moskowitz and Lehner. See Manning, No. 102757/94, slip op. at 9.
Even assuming, as OCF contends, that the only aspect of Didner that Justice Freedman subsequently rejected was the use of a formulaic multiplier of $100,000 per month, and in Manning she increased the "reasonable" multiplier to $129,000 per month, see id. at 8-9, the "Manning" multiplier, if applied, would yield an amount greater than OCF's proposed $3.5 million. A strict application of a $129,000 per month multiplier would net an amount of $4,128,000.
In early 1996, Justice Freedman not only reiterated that Didner is no longer controlling, but was critical of the reliance placed thereon by the Second Circuit in Consorti II, to the exclusion of other, more recent experience, and noted that "while in the past I have remitted cases to lower amounts, it seems the juries are continuing to come in with higher verdicts." Tr. of Proceedings at 2551-2, Falloon v. Westinghouse Elec. Corp., No. 10893/95 (N.Y.Sup.Ct.1995).
Justice Freedman's preliminary remittitur in Falloon reduced the pain and suffering award of $14.6 million to $5.2 million. She stated, "I've gone a little higher than the Second Circuit, but I think perhaps the Second Circuit was a little low...." Id. at 2554. Consorti states that Justice Freedman's remittitur of the future pain and suffering award from $9.4 million to $3.6 million is in line with the instant jury's award of $4 million for Consorti's future pain and suffering.
OCF counters by stating that the remittitur was 64% of the award, and a comparable remittitur in the instant case would result in a reduction of Consorti's award to $4.3 million. Taking the "amount of suffering per month approach," however, would yield $162,500 per month or an award of $5.2 million for Consorti.
Justice Karla J. Moskowitz of the Supreme Court for New York County, in 1997, reduced a mesothelioma damage award from $6.5 million to $5 million. See Ronsini v. Garlock, No. 108809/96, slip op. at 5 (N.Y.Sup.Ct. May 20, 1997). The award for past pain and suffering was reduced from $4 million to $3.5 million, and the award for future pain and suffering was reduced from $2.5 million to $1.5 million. In reaching her decision, Justice Moskowitz observed that:
Frank Ronsini is relatively young (46 years), was in otherwise excellent health, had strong employment prospects and a previous vigorous lifestyle. Mr. Ronsini's testimony (by videotape) showed a strong, articulate man who was fully aware of what he had already been through and would have to endure in the future. He had symptoms of the disease beginning in November, 1994. By the time of trial, he had fought the disease for more than two years, a relatively long time, and undergone several procedures. The jury had ample basis to make its awards, as reduced. The awards deviate from reasonable *316 compensation only to the extent found. The awards, as reduced, for pain and suffering do not materially deviate from reasonable compensation for this disease for this length of time for such a relatively young man.
Id. at 5-6.
Finally, Justice Edward H. Lehner, on the heels of the Ronsini decision, remitted various awards for the pain and suffering of plaintiffs who also died from mesothelioma. See Dollas, 173 Misc.2d 121, 660 N.Y.S.2d 803 (N.Y.Sup. May 29, 1997). The amounts per month of pain and suffering in Dollas ranged from approximately $105,000 per month to $150,000 per month. See id. at 124-25, 660 N.Y.S.2d at 805.
The cases above comprise the universe of cases against which Consorti's $12 million award is compared. Pursuant to the following reasoning, the Second Circuit's decision in Consorti II is not included.

B. The Second Circuit's Decision in Consorti II

OCF has contended that there is no basis for this Court to reject the Second Circuit's comprehensive analysis and that therefore Consorti should receive no greater than $3.5 million for his pain and suffering. According to OCF, (1) the Second Circuit articulated the proper standard of review, assembled the relevant cases, and reviewed Consorti's case, including the relevant testimony pertaining to his medical decline; (2) it concluded that Consorti's award, three times the upper range of permissible awards, was excessive; and (3) deferring as much as possible to the jury award, the Second Circuit remitted the award to $3.5 million  an amount approximately 17% greater than what the court itself had characterized as the "maximum", Consorti II, 72 F.3d at 1015.
Contrary to OCF's contention, however, the Second Circuit's application of CPLR § 5501(c) to the facts of this case was vacated by the United States Supreme Court. Additionally, the Second Circuit's finding will not be adopted because the trial court before whom testimony was presented is the best auditor of a jury's damage award, and the New York state cases decided subsequent to Consorti II have provided guidance as to what amount may be reasonable in this case.
The Supreme Court vacated the Second Circuit's decision in Consorti II and remanded the case back to the Second Circuit "for further consideration in light of Gasperini ...." Consorti III, 116 S.Ct. at 2576. Likewise, in Gasperini, the Supreme Court instructed the Second Circuit to remand that case "to the District Court so that the trial judge, revisiting his ruling on the new trial motion, may test the jury's verdict against CPLR § 5501(c)'s `deviates materially' standard." Gasperini, 116 S.Ct. at 2225.
The only holding that the Gasperini Court upheld was that CPLR § 5501(c) provides the proper standard of review for the district court. Indeed, the Court found that it was error for the Second Circuit to have applied this standard itself instead of reviewing the district court's decision for abuse of discretion. Id. The Gasperini Court stated:
Within the federal system, practical reasons combine with Seventh Amendment constraints to lodge in the district court, not the court of appeals, primary responsibility for application of § 5501(c)'s "deviates materially" check. Trial judges have the "unique opportunity to consider the evidence in the living courtroom context," while appellate judges see only the "cold paper record."

Id. (citations omitted) (emphasis added).
Thus, given Gasperini, the Consorti II court remanded the case to this Court to apply the "material deviation" standard. The Second Circuit determined that its review was "plenary, rather than appropriately limited to review for abuse of discretion." Consorti IV, 103 F.3d at 4.
OCF nonetheless defends the Consorti II finding by stressing that the Second Circuit analyzed "a large number of recent New York State court decisions which strongly indicated that the Consorti award was far beyond what New York law permits," Consorti II, 72 F.3d at 1014, and thereby affirmatively established the range of permissible mesothelioma pain and suffering awards. By focusing its material deviation analysis on the remittitur motions granted with regard to *317 the 15 pain and suffering verdicts reported in Didner and N.Y. Navy Yard, the Second Circuit concluded that there was a "consistent pattern over a considerable number of cases of death by mesothelioma, of reduction of jury verdicts for pain and suffering by New York courts to figures ranging from approximately $1 million to a maximum of $3 million." Id. at 1015.
Moreover, OCF urges that the Second Circuit considered closely the particular facts of Consorti's case and concluded that there was no evidence that Consorti's pain and suffering experience was worse than that of the plaintiffs in any of the cases Justice Freedman had previously considered. The Second Circuit noted that "[a]lthough we recognize that John Consorti's suffering was very great, Justice Freedman's cases also all involved deaths from mesothelioma. It is not suggested to us that the suffering of the plaintiffs she considered was any less horrendous." Id.
However, not only did this Court  and the jury  have the opportunity to observe Consorti during his courtroom appearances, but because of photographic evidence, as well as his videotape testimony recorded months before the trial, the Court  and the jury  saw the devastating deterioration of his condition over time. This, the Second Circuit did not see.
For example, while the "cold paper record" reflected that Consorti's "circulatory system was impaired, causing painful and disfiguring swelling of his head and neck," id. at 1009, the Court and jury actually saw this swelling in the context of a body that had recently lost 38 pounds. Also, the Second Circuit did not see Consorti's profuse sweating caused by the air conditioning that provided relief to everyone else in the courtroom. Likewise, it did not see Consorti's futile attempts to walk up to the witness stand without the assistance of a cane.
Indeed, upon the "cold paper record" in front of it, the Second Circuit could not differentiate between Consorti and other cancer victims. In sharp contrast, the Court in the instant matter is able to compare Consorti with three other mesothelioma cases and the other asbestos plaintiffs over whose cases it has presided. It is, as indicated in Gasperini, this unique perspective that counsels for the district court's application of CPLR § 5501(c) and not the Second Circuit's.
Finally, Justice Freedman stated in Manning that "Didner may no longer be controlling." Manning, No. 102757/94, slip op. at 9. That was in February 1995, a little over a year and a half after the Consorti verdict. Didner, however, was decided in December 1990, over two and a half years before the verdict. No authority has been cited to suggest that a court may not take guidance from post-verdict cases in determining whether an award deviates materially from reasonable compensation. Even though the Second Circuit discussed and rejected Manning as noted above, it also added that the "Manning decision does not alter our view of the problem [since] the reduction to $4 million does not differ significantly from our reduction to $3.5 million," Consorti II, 72 F.3d at 1015 n. 16, thereby suggesting that post-verdict cases are not off limits in a § 5501(c) inquiry.

C. Consorti's Pain and Suffering Award Will Be Remitted to $5 Million Unless Consorti Prefers a New Trial on the Issue

Once the cases against which to gauge the award at issue have been identified,[7] the next question concerns the methodology to be applied in making the comparison. Because each individual's human suffering is unique, comparison of one mesothelioma victim with another is a complex and necessarily discretionary task. Granted, while it is tempting to adopt the Second Circuit's finding, as proposed by OCF, the easy way out (as often is the case) is not necessarily the correct or just approach. The various methods employed for assessing *318 a reasonable damage amount include the application of (1) a percentage reduction based on the percentage used to reduce verdicts in similar cases, (2) a monthly multiplier, or (3) a totality of circumstances approach.
There is no rhyme nor reason to the "percentage approach." First, reducing Consorti's award by the same percentage of reduction applied in another case eliminates from the analysis the human element. Second, aside from OCF's papers which include comparative percentage reductions, this is not an approach followed by the sample cases above. Thus, this approach is summarily rejected.
Included in the discussion of comparable state court decisions above, mention was made to the "monthly multiplier" approach for assessing the damages figure. Using this approach, a figure is calculated to represent an amount that is reasonable for a mesothelioma victim to be awarded per month of pain and suffering. This figure is then multiplied by the number of months of past and projected future pain and suffering.
In Dollas, Justice Lehner, having examined the awards made in cases involving mesothelioma, observed that "it appears that the amounts sustained have generally varied proportionately depending on the length of the period between the oncoming of the symptoms and the time of death or, in cases where a plaintiff is still living, to the date of trial for past injuries." Dollas, N.Y.L.J., June 4, 1997, at 26. He further stated that "[w]hile, as a mechanical formula, awards based on the number of months of suffering [have been] criticized ..., it nevertheless represents a general pattern to the New York cases." Id.
The Dollas court, nonetheless, rejected the simplistic monthly multiplier approach and determined its remittitur by "[c]onsidering all the testimony as to the suffering of the ... decedents, including the period of time of such suffering," not by mere calculation of the duration of the disease. Id. Moreover, even though the discussion of Manning above stated that the remittitur in that case represented a multiplier of $129,000 per month, Justice Freedman in Manning retreated from the practice of applying multipliers and instead embraced the more amorphous "reasonableness" standard for remittitur motions. See In re Asbestos Litig., 986 F.Supp. at 770.
The Consorti II court, which discounted the assumption that duration of disease would necessarily increase the amount of damages, aptly articulated the rationale behind the abandonment of monthly multipliers:
[R]igid application of a monthly multiplier for diseases of significantly different durations is an oversimplification, as well as inconsistent with New York precedent. Unquestionably, the duration of suffering is a relevant factor. But it cannot be automatically assumed that suffering which lasts 30 months, from onset of illness to death, should command a verdict three times that of a case where ten months pass from onset to death.
Consorti II, 72 F.3d at 1013-14.
In the instant case, a totality of circumstance approach will be employed. It represents the least arbitrary, albeit most subjective, method for assessing a reasonable award. Thus, while the duration of Consorti's illness will be considered, it is not the sole ground for determining the reasonableness of pain and suffering damages. The testimony regarding the degree of suffering endured must also be factored into a finding of reasonableness.
Consorti suffered for a total of approximately 32 months due to the mesothelioma. At the early age of 51, the disease won the battle over his life.
On the day that he testified, Consorti, once an athletic young man, hobbled to the witness chair and with his head and face distorted from the compression of his superior vena cava, gently spoke to the jury in the whisper of a voice that remained with him. Having lost 38 pounds due to his mesothelioma, Consorti was still unable to button his top button because of the swelling of his head and neck.
Although the air conditioning provided relief to most in the courtroom, it resulted in fever and hospitalization from Consorti's earlier appearance in court and caused him to sweat profusely as he gave his testimony.
*319 In preparing to present himself for trial, Consorti, a proud man, could not bathe or dress himself. Indeed, he tried in vain to resist his wife's insistence that he walk in front of the jury with the assistance of a cane.
On the day he appeared at trial, Consorti's right leg was immobile from the mesothelioma pinching the nerves, and his entire right arm was either numb or in pain. He had been to the doctor and made an emotionally draining visit to Veteran. As Consorti testified: "I had a lot of hope, but it seems like every time I'm turning around, I'm getting struck down. I'm becoming more negative. I'm becoming more afraid, frightened. I wake in the morning in an awful lot of pain, and I wish I was dead a lot of times." (Trial Tr. at 1447.) Still, Consorti's condition on July 1, 1993, was the best it would ever be again. As the evidence demonstrated, the remaining nine months of Consorti's life consisted of pain and denial.
Consorti did not lift his grandson, Brian, nor celebrate Brian's second birthday. He was unable to be intimate with his wife, Frances, who at age 54 had quit her job to become a full-time nursemaid to her husband. She told the jury, "I have to give him a bath because he can't, he can't stand. I spray the shower on him. I dress him. He can't bend. He can't even get his socks on. The simplest things sometimes  sometimes he can't even cut his meat." (Trial Tr. at 1507.)
Prior to the onset of mesothelioma, Consorti, together with Frances, would spend time with the children, spend weekends in the Poconos, fish, go boating, dancing or socializing with friends. Because of his disease, Consorti was reduced to being the object of his family's sympathy and concern.
The summer of 1991 brought the beginning of constant back pain and subsequently shortness of breath. When Consorti's symptoms did not subside, he sought medical evaluation by his pulmonologist who initially treated Consorti with injections for a pulled muscle. After Christmas, the Consortis were informed that the X-rays and CAT scan of his chest did not look good. Finally, at the end of February 1992, Consorti underwent a thoracotomy and was diagnosed with malignant mesothelioma.
Taken aback by the diagnosis, Consorti initially underwent pain and depression therapy with narcotics and antidepressant medication. Consultations with his treating doctors followed, during which the possibilities of chemotherapy and/or radiotherapy were explored and rejected, so as to give Consorti "as must quality time as he could have." (Trial Tr. at 1495.) However, as the pain grew worse and failed to subside with the narcotic pain killers, the Consortis began an odyssey of unconventional treatments which failed and were physically and mentally draining.
Around Thanksgiving 1992, by which time Consorti was in substantial pain and getting progressively worse, he lost his voice. When the condition did not subside after treatment of antibiotics and cough syrup, Consorti in February 1993 went for an MRI which revealed that a tumor that was pressing against his vocal cords was not only growing but invading other tissues and organs.
The tumor interfered with Consorti's eating, swallowing, and breathing. In addition, Consorti was in tremendous pain and discomfort. In fact, his back and side were in so much pain that he could not sleep at night. He was now reduced to spending his days laying down  since he could not sit up for extended periods  and watching television.
As the disease progressed, it became difficult and later impossible for Consorti to walk or care for himself. His pain grew worse as the time passed, and was deepened by the certainty of imminent death. Even more intense and severe than the physical pain Consorti had thus far endured, was the toll mesothelioma had taken on his spirit. Prior to his illness, Consorti was a civic-minded and extremely outgoing individual, as Frances told the Court, "to the point of driving you nuts if you went anyplace because he'd stop and talk to anybody. He loved life, he was full of  he would try anything, do anything. He just loved people...." (Trial Tr. at 1485.) But, as Consorti explained it, "he doesn't feel like a person anymore." (Trial Tr. at 1502.)
*320 The deterioration of Consorti's condition between April, when his testimony was videotaped, to July during testimony at trial, was manifest in the remarkable change in his appearance. As difficult as it is to comprehend the agony Consorti suffered, it is this agony that must be measured rationally in terms of dollars and cents.
Taking into consideration the testimony at trial regarding the degree and type of suffering Consorti endured, the fact that he suffered for thirty-two months, and given the range of permissible state court pain and suffering awards for similar mesothelioma victims, a judgment of $5 million represents the maximum recovery that would not "deviate materially" from awards in similar situations. Therefore, a remittitur in the amount of $7 million is appropriate; alternatively, if Consorti does not accept the remitted judgment, a new trial will be granted.

Conclusion
For the reasons set forth above, the motion for a new trial is granted unless Consorti stipulates to the entry of a new judgment in the amount of $5 million, with appropriate adjustment for prejudgment interest.
Settle judgment on notice.
It is so ordered.
NOTES
[1] The Second Circuit also disagreed with this Court's conclusion that the award to Consorti did not "shock the conscience." Consorti II, 72 F.3d at 1015 n. 14.
[2] Gasperini grounded its finding that a federal district court's review of damages in New York cases is governed by New York's "material deviation" standard rather than the deferential "shock the conscience" standard, see Gasperini, 116 S.Ct. at 2216-18, on the conclusion that "Erie precludes a recovery in federal court significantly larger than the recovery that would have been tolerated in state court." Id. at 2221.
[3] Justice Lehner's published decision at 173 Misc.2d 121, 660 N.Y.S.2d 803, includes an abbreviated analysis of the remittiturs.
[4] The Second Circuit in Consorti II rejected Consorti's contention that the court consider New York County DES Litigation, 211 A.D.2d 500, 621 N.Y.S.2d 332 (1995), where the Appellate Division, First Department sustained pain and suffering awards of $10 and $12 million for young women who contracted clear cell carcinoma. The Second Circuit stated that "the Appellate Division's ruling gives no information about the verdict being upheld," and additionally, "the guidance we have tells us [that the DES case] involved quite different emotional considerations from those arising here." Consorti II, 72 F.3d at 1015 n. 16.
[5] Justice Freedman's published opinion at 151 Misc.2d 1, 572 N.Y.S.2d 1006, omits discussion of remittiturs.
[6] The jury had awarded $1.5 million for past pain and suffering and $3.5 million for an estimated 22 months of future pain and suffering. Manning, No. 102757/94, slip op. at 8.
[7] Consorti has provided a list of pre-remitted jury verdicts rendered by New York juries for pain and suffering of mesothelioma victims as proof that the instant award is not excessive. This list has not been employed in the instant analysis because jury awards that have been found by judges to be unreasonable are the more appropriate measure of what constitutes reasonable compensation in this context.